**Thomas E. LEWIS, an individual,
Appellant**

v.

**INDIAN SPRINGS LAND CORPORA-
TION, a Nevada corporation, Indian
Springs Investment Partners, Ltd., a
Texas limited partnership, and Indian
Springs Joint Venture, a Texas joint
venture, Appellees.**

No. 05–05–00528–CV.

Court of Appeals of Texas,
Dallas.

Nov. 8, 2005.

of Rebellion or Invasion the public Safety   may require it."

R. Larry Macon, Edward S. Koppman, Akin, Gump, Strauss, Hauer & Feld, L.L.P., and Aamer Ravji, Bickel & Brewer, Dallas, for Appellant.

Eric N. Whitney, Greenberg Traurig, LLP, Dallas, for Appellee.

Before Justices WHITTINGTON, FRANCIS, and LANG.

## OPINION

Opinion by Justice LANG.

In this accelerated, interlocutory appeal, appellant Thomas E. Lewis ("Lewis") chal-

lenges the trial court's order overruling his special appearance. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.04(a)(7) (Vernon Supp. 2004–2005). The action below was initiated when appellees sued Lewis, a resident of Florida, respecting his distribution of funds of Indian Springs Land Corporation ("ISLC"). At the time of the distribution of funds, Lewis was president and a shareholder of ISLC.

The relationship of the parties spanned several years and involved a series of business transactions culminating in Lewis's distribution of funds in payment of certain of ISLC's promissory notes. The claims asserted by appellees which challenge Lewis's distribution of funds include breach of contract, breach of fiduciary duty, conversion, fraud, misappropriation of funds, and statutory theft. For the following reasons, we conclude that Lewis is subject to specific jurisdiction in Texas. The trial court's order is affirmed.

## I. The Parties and Participants

Appellee, Indian Springs Investment Partners, Ltd. ("ISIP"), is a Texas real estate development partnership. Its principal place of business is in Addison, Texas. Lewis, a Florida resident, is an attorney and real estate developer. He is a limited partner in ISIP, as is Daryl Snadon ("Snadon"), a Texas resident and real estate developer. Beltway Development Corporation ("Beltway"), a Texas corporation, is the general partner of ISIP. Another appellee, Indian Springs Joint Venture ("ISJV"), a Texas joint venture, has its

principal place of business in Addison, Texas. The venturers include Lewis, Snadon, James Durbin ("Durbin"), a Texas resident and real estate developer, and ISIP. Appellee ISLC, is a closely-held, Nevada, S-corporation. Appellees assert ISLC's principal executive office is in Addison, Texas.[1] ISLC's shareholders are Lewis, Snadon and Durbin. ISLC holds a 99% interest in ISJV with ISIP holding the remaining 1%.

## II. Factual Background

### a. Overview of the Business Transactions

The record reflects a series of business transactions, involving Lewis, appellees and others, which date from 1997 and which culminated in the challenged disbursement of ISLC's funds by Lewis in 2004. These transactions related to the acquisition and development of a tract of residential real estate located in Los Angeles County, California ("California Property"). The participants, in particular Lewis, Snadon and Durbin, consulted with various attorneys and accountants, to form strategies for the profitable development and ultimate sale of the California Property. As discussed below, the transactions included the transfer and assignment by Lewis, Snadon, and Durbin of their respective individual interests in several corporations, joint ventures and partnerships, which held some interest in the California Property, in return for a series of promissory notes payable to each of them at various intervals. The challenged pay-

---

1. Lewis contends the principal office is in Florida. A February 2003 Assignment of Beneficial Interest Under Deed of Trust With Assignment of Rent, a key document in the transfer of the California Property that is central to this case, lists ISLC's address as Addison, Texas. Statements of Information filed with the California Secretary of State on 1/20/04 and 1/24/05 by ISLC identify the prin-

cipal executive office of ISLC as Addison, Texas. However, a 3/3/03 Designation of Foreign Corporation form filed with the California Secretary of State lists Miami, Florida, as ISLC's principal office and a 2/27/03 Exemption from Workers Compensation Form submitted in California lists Miami, Florida, as the ISLC business address.

ment made by Lewis of some of the promissory notes was funded from the proceeds of the sale of the California Property.

### b. History of the Business Transactions

Lewis met Snadon in Aspen, Colorado, in the 1970's. They became good friends.

In 1997, Snadon entered into ISJV with a California citizen, Colleen Welter, and a California corporation, Chatsworth Ridge Estates, Inc. ("CRE"). Snadon, through ISJV, invested millions of dollars to acquire the California Property. CRE owned 10%, Welter owned 40%, and Snadon owned 50% of ISJV. In 1998, Snadon transferred a 2.5% interest to Durbin, leaving himself with a 47.5% interest in ISJV.

In August of 1999, Snadon shared with Lewis his concern over his investment in the ISJV California Property. Soon thereafter, Snadon was diagnosed with cancer and began receiving treatments. Due to this illness, Snadon could no longer manage some of his businesses. Lewis volunteered to help Snadon with his California Property and visited him on September 24, 1999, in Houston, Texas. After numerous subsequent telephone discussions, Lewis met with Snadon November 12–15, 1999, in Dallas, Texas, to discuss the development of the California Property, the role he could play in the project, and the general financial terms of his participation. The provisions of Lewis's financial and partnership interests relative to the California Property were negotiated and documented over the years by Lewis, Snadon, and Durbin through telephone conferences, personal meetings, and numerous other communications between Texas, Florida, California, and Colorado.

In September of 1999, Snadon transferred his remaining 47.5% interest in ISJV to ISIP. On December 1, 1999, Snadon gave Lewis a power of attorney to act for him and execute legal documents on his behalf regarding the California Property. In January of 2000, Snadon assigned one-half of his 99% ownership in ISIP to Lewis.

On January 5, 2001, CRE and Welter transferred their combined 50% interest in ISJV to Snadon. On January 6, 2001, Snadon transferred 25% of ISJV to Lewis and entered into a Amended and Restated Joint Venture Agreement. After that transfer, the ownership of ISJV was ISLP 47.75%, Durbin 2.5%, Snadon 25% and Lewis 25%.

On November 11, 2001, ISLC was incorporated in Nevada, and the shareholders elected S-corporation treatment for federal tax purposes. According to appellees, its principal executive offices were in Addison, Texas. According to Lewis, the principal offices of ISLC were in Miami, Florida.[2]

On January 1, 2002, Lewis was assigned a 48.75% interest in Creekview Phase I, G.P., L.L.C. ("Creekview"), a Texas limited liability company. Creekview's principal place of business was in Addison, Texas. Also, in January of 2002, Snadon, Lewis, Durbin, and ISIP transferred their interests in ISJV to ISLC in exchange for promissory notes.[3] On January 31, 2002,

---

**2.** *See* note 1, *supra.*

**3.** The record reflects a series of promissory notes executed in Dallas, Texas, on January 1, 2002, by ISLC. Two promissory notes for $204,232 and $111,677 were made payable to Durbin in Dallas, Texas. Two promissory notes for $4,084,635 and $1,116,677 were made payable to Snadon in Dallas, Texas. Two promissory notes for $3,798,711 and $2,077,205 were made payable to ISIP in Dallas, Texas. On January 31, 2002, in Dallas, Texas, one promissory note for $1,116,777, was made payable to Lewis in Coconut Grove, Florida. On August 12, 2004, payments were

through an assignment of interests, ISLC became a party to the joint venture agreement and assumed a 99% interest in ISJV with ISIP retaining a 1% interest. On February 14, 2003, Lewis, Snadon and Durbin assigned their interests in Creekview to ISLC in exchange for a $2.2 million dollar promissory note that was payable in Addison, Texas, and governed by the laws of Texas.[4]

According to the record, over several years, Lewis, Snadon, and Durbin, worked to develop the California Property and Snadon made additional cash infusions into it. Then, on October 21, 2002, ISJV and Indian Falls Joint Venture ("IFJV"),[5] yet another Texas joint venture, with its principal place of business in Addison, Texas, sold the California Property to Toll Brothers, Inc. ("Toll Brothers"), a Pennsylvania corporation. The terms of the sale included a cash payment along with a promissory note, which was secured by a deed of trust. On May 3, 2003, ISJV assigned its rights under the deed of trust and promissory note to ISLC.

### c. Factual Allegations for Claims

Our analysis now moves to 2004. At this time, ISLC held all right, title and interest in the deed of trust and promissory note payable by Toll Brothers generated by the sale of the California Property. However, ISLC was obligated on the ser-

ies of promissory notes due to Snadon, Lewis, Durbin, and ISIP which were exchanged for their interests in ISJV and Creekview.

The specific facts alleged in support of the claims brought by appellees against Lewis are the following. On August 12, 2004, Lewis, who was then acting as President of ISLC, negotiated and obtained an agreement whereby Toll Brothers made a partial payment on the promissory note payable to ISLC of $9,307,982.68. Lewis directed Toll Brothers to make the payment to ISLC's Miami bank account on which he was a signatory. Lewis then distributed $3,578,140.79 of that money into his personal Florida bank account and sent six checks to Dallas. Three of the checks were payable to Snadon totaling $3,582,730.29, two were payable to Durbin totaling $185,628.82, and one was payable to Beltway in the amount of $23,517.94. In correspondence dated August 25, 2004, Lewis told Snadon and Durbin that these checks were payments by ISLC of principal and interest due on: (1) the January 2002 promissory notes, made payable to Snadon, Lewis, Durbin, and ISIP when they transferred their interest in ISJV to ISLC, *supra* note 3; and (2) the February 2003 promissory note made payable to Lewis, Snadon, and Durbin when they assigned their interests in Creekview to ISLC, *supra* note 4.[6]

---

made on some of these promissory notes, and one other promissory note referred to in note 4. The payments on these notes are the subject of appellee's suit. *See* note 6, *infra*.

4. The contested disbursements made in 2004 were applied to this promissory note and others referred to in note 3. Paragraph 10 of this promissory note states: *"Governing Law.* This note shall be governed by and construed in accordance with the laws of the State of Texas and the laws of the United States applicable to transactions in the State of Texas."

5. The record is unclear as to the exact time of formation and ownership of this joint venture.

6. Lewis's payment was applied to: (1) principal and interest on the February 14, 2003, promissory note given by ISLC for his 48.75% ownership in Creekview; (2) principal and interest on the January 31, 2002, promissory note; and (3) his 49.5% of the principal and interest on the January 31, 2002, promissory note given by ISLC to ISIP. Snadon's payments were applied to: (1) principal and interest on the February 14, 2003, promissory note given by ISLC for his 48.75% ownership

Appellees claim Snadon and Durbin had no knowledge that Lewis negotiated the prepayment until their checks were received. Upon receipt of these checks, Snadon and Durbin, notified Lewis that he had improperly distributed these funds. They claimed Lewis deliberately ignored other debts that should have been paid, in particular certain alleged obligations payable to Snadon to reimburse his advances for development of the California Property. Finally, they demanded that Lewis return the money to ISLC. Lewis's refusal to return the funds resulted in the filing of the underlying lawsuit against Lewis, where appellees allege contract and tort claims.

### d. Special Appearance to Appellees Lawsuit

Lewis responded to the suit by filing a special appearance claiming that he is not subject to personal jurisdiction in Texas. The parties submitted documents, affidavits, and deposition excerpts in support of their jurisdictional claims. After submission of the special appearance to the trial court, an order was signed which denied the special appearance. No basis· for the ruling was specified in the order. Findings of fact and conclusions of law were not requested, nor filed.

### III. Contentions on Appeal

On appeal, Lewis argues that the trial court erred in denying his special appearance. It is his contention that there are insufficient Texas contacts to support personal jurisdiction because, in particular: (1) he is a Florida resident; (2) served as

president of ISLC, a Nevada corporation; (3) that corporation received the contested funds in Florida from Toll Brothers, a debtor located in Pennsylvania; and (4) he was acting in his capacity as president of ISLC, when he issued checks from a Florida bank account to acknowledged creditors of ISLC, some of whom lived in Texas.

On the other hand, appellees assert that the trial court's denial of the special appearance should be affirmed because Lewis has failed to meet his burden to negate all bases for the court's exercise of personal jurisdiction. Further, appellees posit that the exercise of personal jurisdiction over Lewis fully satisfies the requirements of Texas law and constitutional due process for both general and specific jurisdiction. In particular, they argue there is specific jurisdiction, at least as to the tort claims they allege against Lewis, under the so-called "effects" theory based upon the opinion of the United States Supreme Court in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

### IV. Standard of Review

The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provision of the Texas long-arm statute. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 793 (Tex.2002). A nonresident defendant challenging personal jurisdiction through a special appearance carries the burden of negating all bases of personal jurisdiction. *Id.* Whether a court has personal jurisdiction over a defendant is a question of law. *American*

---

in Creekview; (2) principal and interest on the January 1, 2002, promissory note; and (3) his 49.5% of the principal and interest on the January 1, 2002, promissory note given by ISLC to ISIP. Durbin's payments were applied to: (1) principal and interest on the February 14, 2003 promissory note given by

ISLC for his 2.5% ownership in Creekview; and (2) principal and interest on the January 1, 2003, promissory note. Beltway was general partner of ISIP. Beltway was paid it's 1% of the principal and interest on the January 1, 2002, promissory note given by ISLC to ISIP.

*Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 805–806 (Tex.2002)(citing *BMC Software,* 83 S.W.3d at 794). In resolving this question of law, a trial court must frequently resolve questions of fact. *Coleman,* 83 S.W.3d at 806 (citing *BMC Software,* 83 S.W.3d at 794). Appellate courts review the trial court's factual findings for legal sufficiency and review the trial court's legal conclusions de novo. *BMC Software,* 83 S.W.3d at 794. Where the record contains no findings of fact and conclusions of law, we must imply all findings of fact necessary to support the trial court's findings that are supported by the evidence. *Id.* at 795.

### V. In Personam Jurisdiction

■ The Texas long-arm statute permits Texas courts to exercise jurisdiction over a nonresident defendant that does business in Texas. See Tex. Civ. Prac. & Rem.Code Ann. § 17.041 -.045 (Vernon 1997). The long-arm statute defines "doing business" as: (1) contracting by mail or otherwise with a Texas resident with performance either in whole or in part in Texas; (2) commission of a tort in whole or in part in Texas; (3) recruitment of Texas residents directly or through a intermediary located in Texas; or (4) performance of any other act that may constitute doing business. *Id.* The broad language of the long-arm statute permits Texas courts to exercise jurisdiction "as far as the federal constitutional requirements of due process will permit." *BMC Software,* 83 S.W.3d at 795.

■ Personal jurisdiction over nonresident defendants meets the due process requirements of the Constitution when two conditions are met: (1) the defendant has established minimum contacts with the forum state; and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *BMC Software,* 83 S.W.3d at 795 (citing *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either general or specific jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 413–414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *BMC Software,* 83 S.W.3d at 795–796. General jurisdiction is present when the defendant's contacts in a forum are continuous and systematic so that the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *BMC Software,* 83 S.W.3d at 796; *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990). In contrast, specific jurisdiction is established if the nonresident defendant's alleged liability arises from or is related to activity conducted within the forum. *BMC Software,* 83 S.W.3d at 796. The minimum contacts analysis for specific jurisdiction focuses on the relationship among the defendant, the forum, and the litigation. *Helicopteros,* 466 U.S. at 414, 104 S.Ct. 1868; *Schlobohm,* 784 S.W.2d at 357; *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 790 (Tex.2005).

■ The "touchstone" of jurisdictional due process analysis is "purposeful availment." *Michiana,* 168 S.W.3d at 784 (citing *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). "[I]t is essential in each case that there be some act by which the defendant 'purposefully avails' itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Michiana,* 168 S.W.3d at 784 (quoting *Hanson,* 357 U.S. at 253, 78 S.Ct. 1228).

■ The Texas Supreme Court has recently addressed the proper application

of the concept of "purposeful availment" outlining three important aspects to be considered. First, it is only the defendant's contacts with the forum that count: purposeful availment "ensures that a defendant will not be haled into a jurisdiction solely as a result of ... the 'unilateral activity of another party or a third person.'" *Michiana*, 168 S.W.3d at 785 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). Second, the acts relied upon must be "purposeful" rather than "random, isolated or fortuitous." *Michiana*, 168 S.W.3d at 785 (quoting *Keeton v. Hustler Magazine Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). Third, a defendant must seek some benefit, advantage or profit by "availing" itself of the jurisdiction. By invoking the benefit and protections of a forum's laws, a nonresident consents to suit there. *Michiana*, 168 S.W.3d at 785 (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). It was noted by the court that a nonresident may purposefully avoid a jurisdiction, rather than purposefully avail itself of a jurisdiction, by structuring its transactions so as neither to profit from the forum's laws, nor be subject to its jurisdiction. *Michiana*, 168 S.W.3d at 785 (citing *Burger King*, 471 U.S. at 473, 105 S.Ct. 2174).

In *Michiana* the Texas Supreme Court also discussed the "effects jurisdiction" concept of specific jurisdiction that has developed based on *Calder v. Jones*.

*Calder*, 465 U.S. at 788–89, 104 S.Ct. 1482; *Michiana*, 168 S.W.3d at 789. Appellees urge us to apply here this "effects jurisdiction" concept. They cite, *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265–66 (3d Cir.1998), asserting that "effects jurisdiction" exists where there is: (1) intentional wrongdoing; (2) aimed at a resident of the forum; (3) where the brunt of the harm occurs. However, *Calder* is interpreted by the Texas Supreme Court as turning not only on the direction of the nonresident's intentional actions toward the forum of the resident, but, importantly, on facts reflecting a "substantial presence" in the forum. Specifically, they noted that the allegedly defamatory article was published in the defendant's newspaper and more than 600,000 copies of the publication were delivered into California, the forum state. The Texas Supreme Court concluded "... there was no question the defendant's article constituted a substantial 'presence' in the State." *Michiana*, 168 S.W.3d at 789.

Additionally, the decision in *Michiana* confirmed the rule that jurisdiction must turn on defendant's contacts, not where it "directed a tort." In so doing, it expressly disapproved of cases holding that (1) specific jurisdiction is necessarily established by allegations or evidence that a nonresident committed a tort in a telephone call from a Texas number,[7] or (2) specific jurisdiction turns on whether a defendant's contacts were tortious, rather than the contacts themselves.[8] *Id.* at 792–93. Further, the court concluded that the analysis

---

7. *Boissiere v. Nova Capital, LLC*, 106 S.W.3d 897, 904–05 (Tex.App.-Dallas 2003, no pet.); *Ahadi v. Ahadi*, 61 S.W.3d 714, 720 (Tex.App.-Corpus Christi 2001, pet. denied); *Ring Power Sys. v. Int'l De Comercio Y Consultoria, S.A.*, 39 S.W.3d 350, 353–54 (Tex.App.-Houston [14th Dist.] 2001, no pet.); *Memorial Hosp. Sys. v. Fisher Ins. Agency*, 835 S.W.2d 645, 650–51 (Tex.App.-Houston [14th Dist.] 1992, no writ).

8. *Mabry v. Reid*, 130 S.W.3d 385, 389 (Tex. App.-Beaumont 2004, no pet.); *Boissiere v. Nova Capital, LLC*, 106 S.W.3d 897, 904 (Tex. App.-Dallas 2003, no pet.); *French v. Glorioso*, 94 S.W.3d 739, 746–47 (Tex.App.-San Antonio 2002, no pet.); *Runnells v. Firestone*, 746 S.W.2d 845, 851–52 (Tex.App.-Houston [14th Dist.] 1988, writ denied).

of whether the "tortfeasor knows that the brunt of the injury will be felt by a particular resident in the forum state" is not the operative core of the test. *Id.* at 788–89. Such "foreseeability is not a sufficient benchmark for exercising personal jurisdiction." *Id.* at 789 (citing *Burger King,* 471 U.S. at 474, 105 S.Ct. 2174).

The rules prescribed in *Michiana* have general application for Texas courts regarding Texas "long-arm" jurisdiction. However, the Texas Supreme Court addressed a narrow question: "whether suit can be brought in Texas based on a nonresident's alleged misrepresentations in a telephone call with a Texas resident." *Id.* at 784. The *Burger King* opinion, which is at the heart of the Texas Supreme Court's analysis in *Michiana,* addressed a broader fact situation. Those facts reflected a lengthy history of contacts by the defendant with the forum state. That court found jurisdiction in Florida over a Michigan resident in a franchise agreement breach of contract case. The parties relationship included a history of negotiations between Michigan and Florida, a course of dealings by those parties involving both states, and contacts with the forum state, Florida, over a period of 20 years. In particular, that court recognized that the franchisee, Rudzewicz, "reached out beyond" his home state, Michigan. *Burger King,* 471 U.S. at 479–82, 105 S.Ct. 2174. The court highlighted the significance of the long term contractual relationship in evaluating purposeful availment as follows:

 a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." (quoting *Hoopeston Canning Co. v. Cullen,* 318 U.S. 313, 316–17, 63 S.Ct. 602, 87 L.Ed. 777 (1943)) It is these factors—prior negotiations and contemplated future consequences, along with the terms

of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

471 U.S. at 479, 105 S.Ct. 2174; *see also Zac Smith & Co. v. Otis Elevator Co.,* 734 S.W.2d 662, 665 (Tex.1987).

The Texas Supreme Court also observed the importance of facts relative to contractual relationships in evaluation of jurisdiction.

 Business contracts are generally a matter of physical fact, while tort liability (especially in misrepresentation cases) turns on what the parties thought, said, or intended. Far better that judges should limit their jurisdictional decisions to the former rather than involving themselves in trying the latter.

*Michiana,* 168 S.W.3d at 791.

■ Finally, in addition to minimum contacts, the exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice. *BMC Software,* 83 S.W.3d at 795. The following factors are considered in making that determination: (1) the burden on the nonresident defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering substantive social policies. *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. 559; *Guardian Royal Exchange Assur., Ltd. v. English China Clays,* 815 S.W.2d 223, 231 (Tex.1991).

## VI. Analysis

### a. Purposeful Availment

■ In order to evaluate the facts respecting whether the claims made against

Lewis arise from or are related to activity conducted within Texas, we focus on the "touchstone" of due process, "purposeful availment" as prescribed in *Michiana.* 168 S.W.3d at 785. Our considerations as to the existence of specific jurisdiction turn on Lewis's contacts, not whether his contacts were tortious or where he knew the brunt of the injury would be felt. *Id.* at 788–89.

The first factor described in *Michiana* as relevant in evaluating purposeful availment is the defendant's contacts with Texas. *Id.* at 785. We must ascertain whether Lewis's contacts were the result of the "unilateral activity of another person or a third party." *Id.* The record reflects that Lewis had extensive contacts which he voluntarily made with the forum.

These contacts began because of Lewis's involvement in developing the California Property with Snadon and culminated, at least for our analysis, with the contested disbursement of ISLC's funds. Lewis entered into a partnership, ISIP, and a joint venture, ISJV, organized under Texas law and based in Texas, with Texas citizens. He conveyed his interests in those and other entities, such as Creekview, to ISLC, and now claims entitlement to millions of dollars from promissory notes made payable to his order by ISLC. Importantly, at least one of those promissory notes was executed on February 14, 2003, by ISLC and made payable in Dallas, Texas, in the principal amount of $2.2 million to Lewis, Snadon, and Durbin. The provisions of that promissory note are governed by Texas law.[9] According to Lewis's correspondence to Snadon, the contested distribu-

tion of ISLC funds by Lewis includes a payment on this promissory note, not only to him in the amount of $1,154,186.30, but also to Snadon and Durbin. Lewis's payment was delivered into his account in Florida, while Snadon's and Durbin's payments were made by check and sent to Texas.

Lewis is a founder, shareholder, and owner of companies organized under Texas law.[10] Also, he was president and a shareholder in ISLC, a Nevada corporation. The evidence reflects ISLC had Texas shareholders, and directors, and had its "principal executive offices" in Texas, at least in 2004, when the disbursement of the Toll Brothers funds occurred.

Over the period of five years relevant to this proceeding, Lewis traveled to Texas at least five times to negotiate and manage his Texas-based business interests involved in this suit and he communicated extensively regarding those interests in writing, electronically, and by telephone with his Texas business associates, including Snadon and Durbin, and their advisors. He exercised powers of attorney granted by Snadon, a Texas citizen, and he has executed numerous legal instruments governed by Texas laws, including, assignments of interests, and partnership and joint venture agreements.

■ Additionally, as part of our analysis of the first factor in *Michiana,* we address Lewis's argument that any Texas contacts by him were not in his individual capacity and, therefore, may not be used as a basis for the exercise of personal jurisdiction. *Id.* Lewis refers to this as

---

**9.** *See* notes 3 and 4, *supra.* Specifically, we refer to the note payable by ISLC to Snadon, Durbin, and Lewis executed after the transfer of their interests in Creekview.

**10.** In addition to Creekview, which is a limited liability company, he held an interest in

Capital Lending Associates, Inc., a Texas corporation. Capital Lending was frequently mentioned in the record by the parties. Lewis formed it with Snadon and Durbin during the relevant time period.

the "fiduciary shield doctrine." However, the Texas Supreme Court has never specifically recognized the fiduciary shield doctrine, and the Texas Courts of Appeals have applied the doctrine only on questions of whether general jurisdiction existed over nonresidents. *See Siskind v. Villa Found. For Educ., Inc.,* 642 S.W.2d 434, 438 (Tex.1982); *Morris v. Kohls–York,* 164 S.W.3d 686 (Tex. App–Austin 2005, pet. dism'd); *SITQ E.U., Inc. v. Reata Restaurants, Inc.,* 111 S.W.3d 638, 651 (Tex.App.-Fort Worth 2003, pet. struck). Further, corporate officers are not shielded from the exercise of specific jurisdiction for fraudulent or tortuous acts for which they may be liable. *Calder,* 465 U.S. at 790, 104 S.Ct. 1482; *SITQ,* 111 S.W.3d at 651; *Tuscano v. Osterberg,* 82 S.W.3d 457, 467–68 (Tex.App.-El Paso 2002, no pet.). We cannot conclude that his contacts with Texas did not include those made in his individual capacity. The record reflects that Lewis's contacts with the forum in this case were both in his capacity as an officer and director of Texas-based corporations, including ISLC and Creekview, as well as individually as a partner and venturer in Texas-based entities, including ISIP, and ISJV.

On this record, we cannot conclude that Lewis's alleged conduct was limited to Florida, Nevada, Colorado, and California, as he claims. Nor, can we conclude his conduct in Texas was the result of the "unilateral activity of another party or a third person." *Michiana,* 168 S.W.3d at 785. The record reflects a "substantial 'presence' " of Lewis in the State of Texas. *Id.* at 789.

Addressing the second *Michiana* factor, we consider whether Lewis's conduct was "purposeful" rather than "random, isolated or fortuitous." *Id.* Appellees contend Texas has "effects jurisdiction" based on assertions that Lewis surreptitiously negotiated a substantial advance payment from Toll Brothers on the promissory note, improperly diverted ISLC funds by receiving that payment and depositing it into ISLC's Florida bank account, and then improperly allocated those funds, which allegedly damaged Texas residents. However, the Texas Supreme Court in *Michiana* directs that we not attempt to evaluate jurisdiction on the basis of whether a defendant "directed a tort" toward a Texas party, or knew "that the brunt of the injury would be felt by a particular resident" in Texas. *Id.* at 788–91. Since tort liability tends to be founded upon "what the parties thought, said, or intended," an evaluation of where the tort was "directed" may cause a court to stray from evaluating physical facts. *Id.* at 791. Accordingly, we will not focus upon: (1) the characterization of Lewis's conduct as surreptitious or fraudulent or the merits of such claims; or (2) whether Lewis's conduct was "directed," or aimed at Texas, or the "effects" were in Texas.

It is important to observe again that the receipt and disbursement of the funds received from Toll Brothers was but a part of Lewis's extensive business transactions and activities related to the forum respecting the California Property. Those activities began with a meeting in Texas in 1999 about the California Property, and culminated in the collection of the prepayment from Toll Brothers and disbursement of the proceeds of the sale of the California Property in August of 2004. Subsequent to that initial meeting in 1999, Lewis engaged in the above enumerated transactions, meetings, conversations, and conveyances with Snadon, Durbin, ISIP, ISJV, ISLC, and Creekview. ISIP, ISJV, and Creekview are Texas entities which appear to have held interests in the California Property. Those interests were transferred when Lewis and others transferred their ISIP, ISJV, and Creekview interests

to ISLC. Ultimately, ISLC was the recipient of the proceeds of the sale of the California Property. Lewis's activities involved repeated conduct in Texas. Also, there are documents in the record which reflect that, ISLC, a Nevada corporation, had its principal executive office in Addison, Texas, at the time of the specific conduct complained of, the disbursement of funds on August 12, 2004. At that point in time, Lewis was President of ISLC. He disbursed the funds of ISLC in payment of promissory notes, some of which were payable to him. In particular, it is important for us to consider again, on this point, that the February 14, 2003, promissory note payable by ISLC, in part to Lewis, on which payment was made, was payable in Dallas, Texas, and the law of Texas was expressly designated as the "Governing Law." *See supra*, note 4; *Burger King*, 471 U.S. at 482, 105 S.Ct. 2174. We conclude that Lewis's conduct as it is related to the forum was not "random, isolated or fortuitous." *Michiana*, 168 S.W.3d at 785. Rather, it was "purposeful." *Id.*

Regarding the third *Michiana* factor, we evaluate whether Lewis sought some benefit, advantage, or profit by availing himself of the benefits and protections of Texas. *Id.* We have already noted that the transactions leading up to the payment on the Toll Brothers note involved numerous events of conduct by Lewis in Texas. Lewis attempts to diminish the significance of his conduct by contending that he came to Texas initially to help with business transactions that were in danger of faltering because his good friend Snadon, the developer of the projects, was incapacitated by cancer. However, it is clear from the structure of the various transactions that Lewis was not merely a "Good Samaritan." Appellees characterize Lewis as an experienced and highly successful real estate developer and attorney, apparently well qualified to manage the development

of the California Property. According to the record, he was compensated for his efforts. Also, he received conveyances of interests in assorted business entities, he conveyed some of those interests, and received, in return, rights to be paid on promissory notes, and he received some of the proceeds of the sale of the California Property. In fact, the record reflects contentious correspondence between the parties, where Lewis defended the payment to his own account of a substantial sum from the Toll Brothers promissory note prepayment stating, "As a direct result of my involvement, and after five years of my work on this project, we have successfully sold the property ... you cannot dispute that I have added significant value to the venture." Lewis sought benefit, advantage, or profit by availing himself of the benefits and protections of Texas in the enumerated transactions which were part of, and led to, the Toll Brothers prepayment and the disbursement in August 2004.

Here, the facts reflected in prior negotiations and contemplated future consequences, terms of contracts, and course of dealing reflect that Lewis's activities cannot be characterized as taking place only in states other than Texas. *Burger King*, 471 U.S. at 479, 105 S.Ct. 2174. Lewis repeatedly "reached out" beyond his home state to Texas. *Id.* Accordingly, all three of the factors described in *Michiana* are resolved in favor of determining Lewis's contacts constitute "purposeful availment" of the privilege of conducting activities within Texas. 168 S.W.3d at 785.

### b. Notions of Fair Play and Substantial Justice

We must now address the question of whether the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154; *BMC Soft-*

*ware,* 83 S.W.3d at 795. As to the first factor, the burden on the nonresident defendant, nothing in the record indicates that litigation in a Texas court would be excessively burdensome or inconvenient to him. The record reflects contacts by Lewis with Texas over the period of the transactions described. Based on the quality, nature and extent of Lewis's activity in Texas he should expect to be called into the courts of Texas. Regarding the second and third factors, Texas courts have an interest in adjudicating the claims of Texas residents, and Texas is a convenient forum for the litigants. Litigation in Texas will provide both parties, not just appellees, the benefits and protections of our laws. The fourth factor is the interstate judicial system's interest in obtaining the most efficient resolution of the controversy. This interest will be served by litigation in Texas where most of the individuals and documents involved are located. The fifth factor, the shared interest of other states in furthering fundamental substantive social policies, can be implemented by Texas courts as effectively as the courts of Florida, California, Colorado, or Nevada. Accordingly, we conclude that the exercise of specific personal jurisdiction over Lewis by a Texas court does not offend traditional notions of fair play and substantial justice. *Id.*

## VII. Conclusion

For the foregoing reasons, we conclude the trial court's implied findings are legally and factually sufficient, Lewis failed to carry his burden to negate all of the bases for the trial court's exercise of personal jurisdiction over him, and we affirm the trial court's order denying the special appearance of Lewis. The case is remanded to the trial court for trial on the merits.