# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00334-CV

**Edwin Niehaus, William Ryan and Carrie Wong, Appellants**

**v.**

**Cedar Bridge, Inc., Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT NO. GN401532, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

## O P I N I O N

Appellants Edwin Niehaus, Carrie Wong, and William Ryan appeal the denial of their special appearances. Appellee Cedar Bridge, Inc., sued appellants in their individual capacities, along with their company, Niehaus Ryan Wong, Inc. ("NRW"), based on the breach of a commercial lease. Cedar Bridge asserts that appellants are individually liable because they engaged in a fraudulent transfer of corporate assets that resulted in NRW's inability to pay rent to Cedar Bridge. Appellants contend that they are not amenable to suit in Texas because they are California residents who acted only in their corporate capacities and who received payments only in California. Because personal jurisdiction cannot be based solely on the fact that it was foreseeable to a nonresident that his out-of-state actions may cause injury in Texas, we will reverse the order and render judgment dismissing the claims against appellants for a lack of jurisdiction.

**BACKGROUND**

Appellants formed Niehaus Ryan Wong, Inc., in March 1998. Appellants were the sole owners and comprised the executive team of NRW. The company, which was based in San Francisco, provided public relations services to technology firms, primarily in the "dot.com" industry. Throughout 1998 to 2000, NRW experienced significant growth; during 1999, the company's profit increased by 380%, and its revenue increased by 127%, raising the corporate worth to approximately $21 million by the start of 2000.

Given NRW's success and recognizing the opportunities available in the Austin dot.com market, NRW decided to open an Austin office. In April 2000, NRW entered a commercial lease to rent office space in Austin from Cedar Contracting Corp., the predecessor of Cedar Bridge. The lease named "Niehaus Ryan Wong, Inc., a California corporation" as the tenant and was signed by Niehaus as the "President/CEO" of NRW. It is undisputed that none of the appellants were parties to the lease in their individual capacities. Although appellants each traveled to Texas about six times for business purposes, they maintained residency in and primarily worked in California.

NRW had an established policy of paying biannual bonuses to its employees, including the executive team. It is undisputed that bonuses were transferred from NRW's corporate bank account in California to the appellants' bank accounts in California: no money was transferred from Texas, and appellants received no payments in Texas. The amount of the bonuses was determined by appellants, as NRW's executive team, along with Vincent Sullivan, NRW's chief financial officer, who is not a party to this suit. All three appellants testified that the bonuses were paid around June and December of each year, to reward employees for the work completed in the

2

previous quarters, and that the amount of the bonuses depended on the company's past performance, its current cash flow, and its projected profits. With each year of enhanced financial success, the amount of bonuses paid by NRW increased. In June and December 2000, each of the bonuses paid to appellants was approximately one million dollars,[1] which Wong testified "was directly reflective of the . . . banner year that we saw in 2000."

Everything changed in the first quarter of 2001, when the "dot.com bust" hit the industry. NRW's primary client-base was made of dot.com companies who, as a result of their financial hardship, drastically cut expenses, including the PR services offered by NRW. Appellants testified that NRW had lost several clients by February 2001 and "all of the sudden" had "a very severe and dramatic downturn in terms of cash flow." NRW began cutting expenses and laying off employees. Appellants did not receive any bonuses in 2001; the December 2000 bonuses were their last. Their salaries were reduced from approximately $230,000 in December 2000, to $12,000 in April 2001, and then to $1 per month in November 2001.[2]

In June 2001, the appellants, as NRW's executive team, decided to close the Austin office. Ryan testified that "we just had to make a business decision. It was a hard business decision." In August or September 2001,[3] NRW stopped paying Cedar Bridge rent for the lease of its Austin office.

---

[1] Niehaus testified that, in 2000, his bonuses "may have both been over a million dollars"; Ryan testified that his 2000 bonuses were each around $800,000; Wong testified that "to the best of [her] recollection" she received bonuses of $700,000 and of "just over a million dollars" in 2000.

[2] At that point, appellants resigned from their executive positions and remained on the pay-role merely as "consultants." NRW officially ceased operations in March 2002.

[3] The record does not demonstrate or allege a specific date of default.

Cedar Bridge filed suit in Travis County against appellants, individually, and NRW, alleging that they were liable for breaching the lease. NRW's potential liability on the lease was clear because the corporation was named as the tenant to the lease. *See* Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (West 1997) (contracting with Texas resident to perform in whole or in part in state constitutes "doing business" in Texas). Accordingly, NRW did not contest its amenability to suit in Texas. Cedar Bridge's claims against Niehaus, Ryan, and Wong, however, were less direct. Cedar Bridge asserted that, although appellants were not parties to the lease in their individual capacities, they were individually liable for breaching the lease because the bonuses paid in 2000 constituted a fraudulent transfer in detriment of Cedar Bridge's creditor rights. *See* Tex. Bus. & Com. Code Ann. §§ 24.005-.006 (West 2002) (Texas Uniform Fraudulent Transfer Act). Essentially, Cedar Bridge alleged that—because appellants were aware in December 2000 of NRW's creditors (including Cedar Bridge) and either knew or should have known that the stock market was about to crash—they should not have taken approximately $3 million in bonuses at that time.

Appellants each filed special appearances, *see* Tex. R. Civ. P. 120a, claiming that Texas lacked personal jurisdiction over them because (1) all actions regarding the Cedar Bridge lease were performed in their corporate capacities, (2) all payments from NRW to them occurred in California, and (3) they did not know and should not be expected to have known that the dot.com industry would crash in January 2001, meaning that they did not accept their biannual bonus with any intent to defraud NRW's creditors. Niehaus, Ryan, and Wong each attached affidavits swearing to these facts.

Appellants' pleadings and affidavits also negated the standard jurisdictional facts, such as not having a residence, maintaining an agent, a place of business, a bank account, real or

4

personal property, personal employees, or a mailing address in Texas; not committing a tort or entering a contract in Texas; and not paying taxes in Texas. *See Shapolsky v. Brewton*, 56 S.W.3d 120, 131 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). These facts are not disputed by Cedar Bridge.

A special appearance hearing occurred on April 21, 2005. The trial court overruled the special appearances without stating the grounds.[4] Appellants requested findings of fact and conclusions of law, but none were issued. *See* Tex. R. Civ. P. 296.[5] This accelerated, interlocutory appeal followed. *See* Tex. R. App. P. 28.

In two issues, appellants contend that the trial court erred by denying their special appearances and that there is not legally sufficient evidence to support any implied findings made by the trial court. We will address these issues together.

## ANALYSIS

A defendant who challenges the exercise of a trial court's jurisdiction through a special appearance bears the burden of negating all jurisdictional bases asserted by the plaintiff. *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex. 1985). A nonresident defendant who has been denied a special appearance may bring an interlocutory appeal of the order, and we will

---

[4] The hearing was conducted by visiting judge Pete Lowry, who orally denied the special appearances at the conclusion of the hearing. Approximately three weeks later, Judge Lora Livingston signed a written order of denial. In neither instance were any grounds provided.

[5] Texas Rules of Civil Procedure 296 and 297 do not impose any duty on the trial court to file findings of fact and conclusions of law where there has been no trial," such as a special appearance that is subject to interlocutory appeal. *Bruno's Inc. v. Arty Imps., Inc.*, 119 S.W.3d 893, 897 n.2 (Tex. App.—Dallas 2003, no pet.) (citing Tex. R. App. P. 28.1).

review *de novo* the legal question of whether a Texas court can properly exercise personal jurisdiction over the nonresident. Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp. 2005); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2001). Where, as here, the trial court denied the special appearance without delineating findings of fact and conclusions of law, all facts necessary to support the order are implied in its favor, if they are supported by the record. *BMC Software*, 83 S.W.3d at 795. When a clerk's and reporter's record are included on appeal, as here, these implied findings may be challenged for both legal and factual sufficiency. *Id*.

A Texas court may exercise personal jurisdiction over a nonresident defendant when it is authorized by the Texas long-arm statute and when it comports with the constitutional guarantees of due process. Tex. Civ. Prac. & Rem. Code Ann. § 17.042; *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex. 1990). Because the broad language of the Texas statute allows it to reach as far as the federal Constitution permits, the due process analysis under state law is consistent with the federal test. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991).

Although a nonresident defendant may be subject to the jurisdiction of a Texas court based on a finding of either general or specific personal jurisdiction, *see Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-15 (1983), Cedar Bridge expressly confined its argument to the existence of specific jurisdiction over appellants.[6] A three-prong test must be satisfied to

---

[6] Thus, we need not address the "fiduciary shield" doctrine, which was argued in appellants' brief, prior to Cedar Bridge's narrowing of the issue. *See Ennis v. Loiseau*, 164 S.W.3d 698, 706-07 & n.4 (Tex. App.—Austin 2005, no pet.) (fiduciary shield has been applied by Texas courts only to general jurisdiction analysis); *Morris v. Kohls-York*, 164 S.W.3d 686, 696 (Tex. App.—Austin 2005, pet. dism'd) (same).

determine that the exercise of specific jurisdiction complies with the long-arm statute and due process guarantees: (1) the nonresident defendant must purposefully do some act or consummate some transaction as to establish minimum contacts with the forum state, (2) the cause of action must arise from or be related to these contacts, and (3) the assumption of jurisdiction by the forum state must not offend the traditional notions of fair play and substantial justice. *Schlobohm*, 784 S.W.2d at 358.

The supreme court recently clarified that the "touchstone" of this analysis is whether the nonresident has "purposefully availed" himself of the benefits of conducting business in the forum state. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005).[7] In making this decision, courts are to focus on (1) only the defendant's contacts, not the unilateral actions of a third party, (2) whether the defendant's actions were purposeful and not "random, isolated, or fortuitous"; and (3) whether "the defendant [sought] some benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Id*. at 785.

In emphasizing the importance of "purposeful availment," the *Michiana* Court held that a nonresident defendant's ability to foresee that his actions would cause harm in the forum state "is not a 'sufficient benchmark' for exercising personal jurisdiction." *Id*. at 789 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). The Court explained that it is problematic to focus on where the brunt of the injury was felt, rather than where the defendant's actions were carried out, because to do so ignores that the nexus required for specific jurisdiction is a substantial

---

[7] The trial court in this case did not have the benefit of the *Michiana* opinion because it was not released until fifteen days after the trial court denied appellants' special appearances. *See* 168 S.W.3d 777, 784 (Tex. 2005).

connection between the *defendant*, the forum, and the litigation—not the *plaintiff*, forum, and litigation—and it confuses the legal jurisdictional inquiry with a factual analysis of the merits. *Id*. at 789-90; *see also* Charles W. "Rocky" Rhodes, *The Predictability Principle in Personal Jurisdiction Doctrine: A Case Study on the Effects of a "Generally" Too Broad, but "Specifically" Too Narrow Approach to Minimum Contacts*, 57 Baylor L. Rev. 135, 167-68 (2005) (warning against use of "forseeability of injury" as jurisdictional gravamen).

Accordingly, the *Michiana* court expressly disapproved of cases holding that a nonresident is subject to personal jurisdiction based on an allegation that the defendant "directed a tort" at Texas. 168 S.W.3d at 788-90. The court instructed that the existence of specific jurisdiction depends on "the contacts themselves," not on "whether [the] contacts were tortious." *Id*. at 792; *see also Lewis v. Indian Springs Land Corp.*, 175 S.W.3d 906, 914-15 (Tex. App.—Dallas 2005, no pet.) (discussing *Michiana*); *Le Meridien Hotels & Resorts v. LaSalle Hotel Operating P'ship*, 141 S.W.3d 870, 879, 880 (Tex. App.—Dallas 2004, no pet.) (because "causing an injury in Texas cannot, in and of itself, establish minimum contacts sufficient to establish personal jurisdiction," proof of "tortious activities purposefully directed at the State" was insufficient to overcome special appearance).

Also important to the jurisdictional analysis is that a corporate officer, in his individual capacity, cannot be said to have established minimum contacts with the forum based on the activities of his corporation, absent other evidence, such as proof sufficient to "pierce the corporate veil." *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 438 (Tex. 1982); *see also* Tex. Bus. Corp. Act Ann. art. 2.21, § A(2) (West 2003); *Puri v. Mansukhani*, 973 S.W.2d 701, 713 (Tex. App.—Houston [14th Dist.] 1998, no pet.). However, even if all of the officer's actions were

8

performed in his corporate capacity, the officer may be subjected to personal jurisdiction and held liable in his individual capacity for those actions if they were tortious or fraudulent. *Lewis*, 175 S.W.3d at 917; *Ennis v. Loiseau*, 164 S.W.3d 698, 707 (Tex. App.—Austin 2005, no pet.); *SITQ E.U., Inc. v. Reata Rest., Inc.*, 111 S.W.3d 638, 651 (Tex. App.—Fort Worth 2003, pet. denied). Yet, just as when the minimum contacts of any nonresident defendant are analyzed, a corporate officer's tortious or fraudulent activity will only be sufficient to establish specific jurisdiction if it satisfies the three-pronged due process inquiry, as recently clarified by the supreme court. *See Michiana*, 168 S.W.3d at 788-89; *Schlobohm*, 784 S.W.2d at 358.

Here, although appellants were not individually obligated by the lease, which named only NRW as a tenant, specific jurisdiction could be asserted over them individually based on either (1) the corporation's acts in breaching the lease, if Cedar Bridge offered sufficient evidence to pierce the corporate veil, or (2) appellants' fraudulent or tortious actions, if those acts constituted "purposeful availment" and were substantially connected to the underlying litigation and to the forum. Because Cedar Bridge did not adduce any proof to pierce the corporate veil,[8] the only basis

---

[8] A year after filing its original petition, and only two days before the special appearance hearing, Cedar Bridge filed an amended petition asserting for the first time "alter ego" as a basis for asserting personal jurisdiction over the individual appellants. Appellants objected to the consideration of this claim because Cedar Bridge failed to file its amended petition at least seven days prior to the hearing. *See* Tex. R. Civ. P. 63. No ruling on this objection is apparent from the record. However, we do not consider Cedar Bridge's "alter ego" argument because, even if timely pled, Cedar Bridge presented no argument about alter ego in its brief to this Court, and the record reflects no evidence of alter ego presented to the trial court. *See* Tex. R. App. P. 38.1 (appellant's brief must contain "a clear and concise argument . . . with appropriate citations to authorities"); *see also Hoffmann v. Dandurand*, 180 S.W.3d 340, 347 (Tex. App.—Dallas 2005, no pet.) (exception to defendant's burden to negate jurisdictional facts is "when the claimant asserts the alter ego theory as the basis for personal jurisdiction over the nonresident," then "[t]he claimant must prove that the nonresident is actually the alter ego of the resident corporation"); *Carone v. Retamco Operating, Inc.*, 138 S.W.3d 1, 10-11 (Tex. App.—San Antonio 2004, pet. denied) (same).

for asserting specific jurisdiction over appellants in their individual capacities is Cedar Bridge's allegation that they committed a fraudulent transfer of corporate assets, in detriment of Cedar Bridge's rights as a creditor, when they received the December 2000 bonuses. *See* Tex. Bus. & Com. Code Ann. §§ 24.005-.006.

The trial court's denial of appellants' special appearances implies that the court found evidence in the record to support specific jurisdiction; namely, that appellants had purposefully engaged in some act that arose from or related to the allegedly fraudulent transfer and that was substantially connected to the State of Texas. *Helicopteros*, 466 U.S. at 414 (nexus required for specific jurisdiction); *BMC Software*, 83 S.W.3d at 795 (appellate court should imply necessary findings). To uphold such findings, however, they must be supported by the record. *BMC Software*, 83 S.W.3d at 795.

The record demonstrates that all actions regarding the December 2000 bonuses occurred in California: the executive team's decision to pay the bonuses was made in California, the funds were taken out of NRW's corporate bank account in California, the appellants received the bonuses in California, and the funds were deposited into appellants' California bank accounts. This evidence is undisputed. The only aspect of the December 2000 bonus payment that arguably affected Texas was that, nearly a year after the payments were made to appellants and following the crash of the dot.com market, Cedar Bridge did not receive rent payments from NRW because the corporation lacked sufficient funds to pay its rent. However, *Michiana* dictates that, without more, the fact that a nonresident could foresee that his out-of-state actions would cause injury in Texas is not sufficient to hale the nonresident into Texas to litigate that injury. *See* 168 S.W.3d at 789-90; *see also Lewis*, 175 S.W.3d at 914-15 ("*Michiana* confirmed the rule that jurisdiction must turn on defendant's

10

contacts, not where it 'directed a tort.' . . . Further, the court concluded that the analysis of whether the 'tortfeasor knows that the brunt of the injury will be felt by a particular resident in the forum state' is not the operative core of the test.") (citations omitted); *Dowdy v. Miller*, 122 S.W.3d 816 (Tex. App.—Amarillo 2003, no pet.) (jurisdiction not established over defendant who depleted corporate funds to detriment of Texas creditor and to benefit of himself because all relevant actions occurred in Mississippi and only injury felt in Texas).

Thus, even if we assume that appellants engaged in the allegedly fraudulent transfer, it is undisputed that none of the related activity occurred in Texas. There is nothing in the record before us that connects appellants' executive decision to transfer the funds or the actual transfer of funds with the State of Texas.[9] The concept that appellants could be subject to personal jurisdiction in Texas based on allegations that they committed tortious or fraudulent activity in California that had repercussions in Texas was directly considered and rejected by the supreme court in *Michiana*, 168 S.W.3d at 790-92. Although the injury felt in Texas may constitute a contact with the forum, it does not, on its own, constitute "sufficient minimum contacts" with the forum for jurisdictional purposes. *See id.* To require a nonresident defendant to litigate such liability within the state of Texas, the defendant must have "purposefully availed" himself of the benefits of conducting business

___

[9] Although the record demonstrates that, on behalf of NRW, appellants traveled to Texas and engaged in communications with Texas residents, these contacts cannot be considered as support for specific jurisdiction because they are in no way connected to the allegation of fraudulent transfer. *See Michiana*, 168 S.W.3d at 790 (relationship required between defendant, forum, and litigation). At most, these contacts may have supported a claim for general jurisdiction, if not protected by the fiduciary shield doctrine. But again, Cedar Bridge expressly limited its argument to specific jurisdiction. Therefore, to any extent that the trial court relied on these contacts in denying appellants' special appearances, that decision was erroneous. *Ennis*, 164 S.W.3d at 706 (implied findings that are erroneous should be set aside).

11

in this state. *Id*. at 784. Without a single connection between the forum and the allegedly fraudulent activity, this requirement is not satisfied, and due process forbids a Texas court from asserting specific jurisdiction over the nonresident. *See Schlobohm*, 784 S.W.2d at 358. In confining one's activities to another forum, "a nonresident may purposefully avoid a particular jurisdiction by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction." *Michiana*, 168 S.W.3d at 785.

Cedar Bridge urges that *Ennis v. Loiseau* is controlling authority that supports the denial of appellants' special appearances. 164 S.W.3d 698. In *Ennis*, this Court determined that the nonresident defendant was subject to specific jurisdiction in his individual capacity because there was sufficient evidence in the record to suggest that he had used his corporate identity to participate in a fraudulent scheme for which he could be individually liable. *Id*. at 710. While the facts are in some ways similar to the instant case, there is a critical distinction. The fraudulent activity engaged in by Ennis occurred, to a large extent, within the State of Texas. *Id*. at 705, 710 (fraudulent scheme was "operating out of Texas," and record demonstrated Ennis had knowingly traveled to Texas and entered contracts with, communicated with, and derived profits from Texas residents as part of scheme). Thus, in *Ennis*, the requisite nexus was present: the defendant purposefully engaged in fraudulent activity within the forum, and the litigation arose from that activity. Consequently, Ennis could reasonably anticipate being haled into a Texas court, and the assertion of specific jurisdiction complied with due process. *Id*. at 710-11; *see also Michiana*, 168 S.W.3d at 789 (proper inquiry focuses on defendant's conduct and connection with forum). In contrast, the record here is devoid of any evidence linking appellants' allegedly fraudulent activity to the State of Texas; all activities regarding the December 2000 bonuses occurred in California. Thus, unlike Ennis, appellants did not

"purposefully avail" themselves of doing business in Texas by engaging in this transaction, and they would not have necessarily anticipated being called to Texas to litigate the propriety of the December 2000 bonus payments.[10]

Cedar Bridge additionally relies on *Calder v. Jones* for the principle that specific jurisdiction can be based on a defendant's intentionally directing wrongdoing at the forum state. *See* 465 U.S. 783, 788-89 (California had jurisdiction over nonresident publishers of allegedly libelous story written about Californian with knowledge that it would have widest distribution in forum and severe impact on resident's career in California-based entertainment industry). The *Michiana* Court, however, specifically addressed *Calder* and confined the applicability of its analysis to cases like *Calder* where the impact of the nonresidents' activity was tremendous enough to constitute a "substantial presence" in the forum, and the nonresidents could "reasonably anticipate being haled into court there" because they were well-aware of the impact their conduct would have in the forum. 168 S.W.3d at 789. The court explained that "the important factor [in *Calder*] was the *extent* of the defendant's activities, not merely the residence of the victim." *Id*. (emphasis added); *see also Lewis*, 175 S.W.3d at 914 ("*Calder* is interpreted by the Texas Supreme Court as turning . . . importantly, on facts reflecting a 'substantial presence' in the forum.").

---

[10] Cedar Bridge also cites *SITQ E.U., Inc. v. Reata Rest., Inc*., 111 S.W.3d 638 (Tex. App.—Fort Worth 2003, pet. denied). *SITQ* also involved the assertion of specific jurisdiction over a corporate officer, individually, based on his fraudulent or tortious activities. It is, however, distinguishable from this case for the same reason as *Ennis*: In *SITQ*, unlike here, the allegedly fraudulent activities were substantially connected to Texas, as demonstrated by the evidence that the nonresident officer (a) sent his agent to a meeting in Dallas with direct orders to vote in favor of the fraudulent plan, (b) participated in drafting correspondence that contained misrepresentations and was delivered directly to the Texas residents harmed by the fraudulent activity, and (c) stood to reap financial benefits from the  money deprived of the Texas residents through the fraud. *Id*. at 650-52.

The instant case is unlike *Calder* because—even if appellants could have foreseen that the acceptance of their December 2000 bonuses, coupled with the crash of the dot.com market in 2001, would deplete NRW's resources to the extent that it could not pay rent to Cedar Bridge—appellants would have no reason to anticipate their actions having a "substantial" impact in Texas. *See Calder*, 465 U.S. at 788-89. Intentionally sending a defamatory publication into a forum where the nonresident knows it will be distributed in large quantities across the entire state, as in *Calder*, is different than intentionally participating in a transaction wholly outside the forum that the nonresident might have known would be harmful to a single creditor within the forum, as here. *See id*. Thus, to the extent that *Michiana* approved *Calder's* reliance on where the effect of the activity was felt as a basis for jurisdiction, that analysis does not support jurisdiction in a case such as this, where any anticipated impact on the forum was far less substantial than in *Calder*. *See Michiana*, 168 S.W.3d at 789.

The court's implied finding that appellants purposefully engaged in activity, which arose out of the December 2000 bonus transaction and which constituted minimum contacts with the state, is not supported by legally sufficient evidence. Hence, in conducting a *de novo* review of the trial court's legal conclusions, we determine that the court erred in concluding that it had specific jurisdiction over appellants in their individual capacities. Appellants' first and second issues are sustained.

Because the record does not support a conclusion that appellants purposefully engaged in minimum contacts with Texas so as to subject them to specific jurisdiction, we need not address whether the exercise of jurisdiction would comport with "the traditional notions of fair play and substantial justice." *See Schlobohm*, 784 S.W.2d at 358.

14

**CONCLUSION**

Having sustained appellants' two issues, we reverse the trial court's order denying their special appearances and render judgment dismissing the claims against them for want of personal jurisdiction.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Reversed and Rendered

Filed: April 7, 2006

15