**COUNTER INTELLIGENCE, INC., Appellant,**

v.

**CALYPSO WATERJET SYSTEMS, INC., Appellee.**

No. 05–06–00021–CV.

Court of Appeals of Texas, Dallas.

Feb. 13, 2007.

Rehearing Overruled March 28, 2007.

Gregory J. Lensing, Cowles & Thompson, P.C., Dallas, for Appellant.

Mark R. Zeidman, Bush & Ramirez, P.C., Houston, C. Christian Frederiksen, Jr., Hallett & Perrin, P.C., Dallas, for Appellee.

Before Justices MORRIS, WHITTINGTON, and RICHTER.

## OPINION

Opinion by Justice WHITTINGTON.

Counter Intelligence, Inc., appeals the trial judge's order denying its special appearance. Because the trial court did not have personal jurisdiction over Counter Intelligence, we reverse the trial court's order and render judgment dismissing Calypso Waterjet Systems, Inc.'s claims against Counter Intelligence for lack of personal jurisdiction.

### Background

Calypso sued Counter Intelligence for breach of contract, business disparagement, tortious interference, and conspiracy. Counter Intelligence filed a special appearance, alleging it is a Maryland corporation with its principal place of business in Maryland, and does not have the minimum contacts with Texas required for

a Texas court to exercise jurisdiction over it. The trial judge held a hearing on the special appearance after which she entered findings of fact and conclusions of law.

The trial judge concluded the exercise of both specific and general jurisdiction was proper over Counter Intelligence. As alleged by Calypso, specific jurisdiction was premised on Counter Intelligence's breach of a contract dated November 3, 2004, in which Counter Intelligence of Silver Spring, Maryland ordered two "Calypso waterjets" from Fox Machinery Associates, Inc. of Bridgeport, Pennsylvania. The contract provided Counter Intelligence would wire funds to Fox Machinery's bank account in Philadelphia, Pennsylvania. Under "Delivery and Terms," the contract also provided, "Freight: F.O.B. Dallas, TX." In its operative petition, Calypso pleaded the trial court had specific jurisdiction over Counter Intelligence because of Counter Intelligence's breach of this contract. There is no allegation Calypso's business disparagement, tortious interference, or conspiracy claims have any connection to Texas.

While Calypso's breach of contract claim was premised only upon the November 3, 2004 contract, Calypso's petition and the evidence offered in the trial court revealed a previous contract between Calypso and Counter Intelligence dated September 29, 2004. Calypso's petition recited that under this contract, Counter Intelligence agreed to purchase a waterjet cutting system from Calypso for $162,050. This contract, on Calypso's letterhead bearing an address in Dallas, Texas, also provided "FOB Dallas, Texas." Both Calypso and Counter Intelligence agree Counter Intelligence satisfied the payment terms of this first contract, although the trial judge refused Counter Intelligence's proposed finding of fact on this point.

Calypso also pleaded and offered evidence that Counter Intelligence had ordered and paid Calypso for over $14,000 in replacement parts and repair charges, sending at least twenty checks to Calypso in Texas in response to over thirty invoices sent by Calypso from Texas. There is no claim in Calypso's petition relating to these repairs and invoices.

Calypso also alleged the trial court could properly exercise general jurisdiction over Counter Intelligence because of Counter Intelligence's continuing contractual relationship with Cosentino U.S.A., a Florida corporation with its principal place of business in Stafford, Texas.

After a hearing, the trial judge concluded Counter Intelligence had sufficient minimum contacts with Texas to permit jurisdiction to be exercised over it in this case and denied the special appearance. Counter Intelligence appeals, alleging in five issues the trial judge erred in concluding the exercise of specific and general jurisdiction was proper.

## Standard of Review

■■■ Whether a trial court has personal jurisdiction over a defendant is a question of law. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex. 2002). In reviewing a trial judge's ruling on a special appearance, we examine all the evidence in the record to determine if the nonresident defendant negated all possible grounds for personal jurisdiction. *Reiff v. Roy,* 115 S.W.3d 700, 705 (Tex. App.-Dallas 2003, pet. denied). If a trial judge enters an order denying a special appearance and issues findings of fact and conclusions of law, the appellant may challenge the fact findings on legal and factual sufficiency grounds. *BMC Software Belgium,* 83 S.W.3d at 794. We may set aside a finding only if it is so contrary to the overwhelming weight of the evidence as to

be clearly wrong or unjust. *See Hoffmann v. Dandurand,* 180 S.W.3d 340, 345 (Tex.App.-Dallas 2005, no pet.). When there is a legal sufficiency challenge, if there is more than a scintilla of evidence to support the questioned finding the no evidence point fails. *Hoffmann,* 180 S.W.3d at 345. We review the trial judge's legal conclusions de novo. *Hoffmann,* 180 S.W.3d at 345.

### Discussion

A Texas court may exercise personal jurisdiction over a defendant only if the defendant has minimum contacts with the state and the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice. *See BMC Software Belgium,* 83 S.W.3d at 795 (citing *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). To establish minimum contacts, the defendant must have purposefully availed itself of the privilege of conducting activities inside Texas and enjoyed the benefits and protections of Texas laws. *Reiff,* 115 S.W.3d at 705. The defendant's activities must justify a conclusion the defendant could reasonably anticipate being called into a Texas court. *Reiff,* 115 S.W.3d at 705.

Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either general or specific jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *BMC Software,* 83 S.W.3d at 795–96. General jurisdiction is present when the defendant's contacts in a forum are continuous and systematic so that the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *BMC Software,* 83 S.W.3d at 796. Under general jurisdiction standards, the cause of action need not arise from or relate to the activities conducted within the forum state by the nonresident defendant, but the minimum contacts analysis becomes more demanding; the contacts must be substantial. *See BMC Software,* 83 S.W.3d at 797 (citing *CSR Ltd. v. Link,* 925 S.W.2d 591, 595 (Tex.1996) (orig. proceeding) (general jurisdiction requires showing that defendant conducted substantial activities within forum, more demanding minimum contacts analysis than for specific jurisdiction)).

In contrast, specific jurisdiction is established if the nonresident defendant's alleged liability arises from or is related to activity conducted within the forum. *BMC Software,* 83 S.W.3d at 796. The minimum contacts analysis for specific jurisdiction focuses on the relationship among the defendant, the forum, and the litigation. *Helicopteros,* 466 U.S. at 414, 104 S.Ct. 1868; *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 790 (Tex.2005); *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990).

The "touchstone" of jurisdictional due process analysis is "purposeful availment." *Michiana,* 168 S.W.3d at 784 (citing *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). "[I]t is essential in each case that there be some act by which the *defendant purposefully avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Michiana,* 168 S.W.3d at 784 (quoting *Hanson,* 357 U.S. at 253, 78 S.Ct. 1228, emphasis added by *Michiana* court). We consider several factors in determining "purposeful availment." *See Michiana,* 168 S.W.3d at 785; *Lewis v. Indian Springs Land Corp.,* 175 S.W.3d 906, 913–15 (Tex.App.-Dallas 2005, no pet.). First, it is only the defendant's contacts with the forum that count: purposeful availment "ensures that a defendant will not be haled

into a jurisdiction solely as a result of . . . the 'unilateral activity of another party or a third person.'" *Michiana*, 168 S.W.3d at 785 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). Second, the acts relied upon must be "purposeful" rather than "random, isolated or fortuitous." *Michiana*, 168 S.W.3d at 785 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). Third, a defendant must seek some benefit, advantage, or profit by "availing" itself of the jurisdiction. By invoking the benefit and protections of a forum's laws, a nonresident consents to suit there. *Michiana*, 168 S.W.3d at 785 (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)); *Lewis*, 175 S.W.3d at 914.

In addition to minimum contacts, the exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice. *BMC Software*, 83 S.W.3d at 795. The following factors are considered in making that determination: (i) the burden on the nonresident defendant; (ii) the forum state's interest in adjudicating the dispute; (iii) the plaintiff's interest in obtaining convenient and effective relief; (iv) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (v) the shared interest of the several states in furthering substantive social policies. *World–Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. 559; *Guardian Royal Exch. Assurance, Ltd. v. English China Clays*, 815 S.W.2d 223, 231 (Tex.1991); *Lewis*, 175 S.W.3d at 915.

## Specific Jurisdiction

In its first issue, Counter Intelligence contends the trial judge erred in concluding that Texas may exercise specific juris-diction over it. In its second issue, Counter Intelligence challenges the legal and factual sufficiency of the evidence to support the trial judge's findings regarding the exercise of specific jurisdiction. We focus our analysis on the relationship between the defendant, the forum, and the litigation to determine if Counter Intelligence's alleged liability arises from or is related to activity conducted in Texas. *See Helicopteros*, 466 U.S. at 414, 104 S.Ct. 1868; *BMC Software*, 83 S.W.3d at 796.

The claim upon which specific jurisdiction is premised is breach of the second contract. There is no claim relating to the first contract. The trial judge found Counter Intelligence was "aware that it was contracting with a Texas party" for both contracts. However, even if this finding was supported by sufficient evidence, awareness that a contracting party is a Texas resident does not necessarily constitute "purposeful availment" for jurisdictional purposes. *See Burger King Corp.*, 471 U.S. at 478, 105 S.Ct. 2174 ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."). Instead, we consider (i) prior negotiations, (ii) contemplated future consequences, (iii) terms of the contract, and (iv) the actual course of dealing. *See Gustafson v. Provider HealthNet Servs., Inc.*, 118 S.W.3d 479, 483 (Tex.App.-Dallas 2003, no pet.) (citing *Burger King*, 471 U.S. at 479, 105 S.Ct. 2174).

Counter Intelligence complains of the trial judge's failure to find, upon its request, "Counter Intelligence, Inc. satisfied the payment terms as to the first order, Exhibit A." The trial judge refused to make this finding of fact. "Refusal of the court to make a finding requested shall be reviewable on appeal." TEX.R. CIV. P.

299. In Calypso's operative petition, it alleged, "[p]ursuant to the first contract ... Counter Intelligence agreed to purchase this waterjet cutting system for a total price of $162,500.00. Counter Intelligence satisfied the payment terms of this contract...." Again in its brief on appeal, Calypso contends "Counter Intelligence satisfied the payment terms of this [the first] contract." Calypso's breach of contract claim is predicated upon Counter Intelligence's alleged breach of the second contract "by failing to pay Calypso for the purchase of one of the two waterjet cutting systems as agreed." There is no breach of contract claim premised upon any breach of the first contract. The trial judge's failure to find Counter Intelligence satisfied the payment terms of the first contract is "so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust." *See Hoffmann,* 180 S.W.3d at 345.

■ Counter Intelligence further challenges the trial judge's finding, "Thus, Counter Intelligence was aware that it was contracting with a Texas party for the purchase of these items." Immediately prior to this finding, the trial judge found:

Calypso filed this suit against Counter Intelligence Incorporated in connection with three waterjet cutting systems that Counter Intelligence ordered. These waterjet systems were ordered "FOB Dallas." (Exhs. A and C to Plaintiff's Response to Special Appearance.) Thus, title to the systems was to be transferred to Counter Intelligence in Dallas, Texas. The first order was placed on Calypso letterhead with a Dallas address.

The evidence supports the trial judge's findings that the waterjet systems were ordered "FOB Dallas;" the effect of the FOB term was to transfer title of the systems in Dallas; and Counter Intelli-

gence was aware Calypso was "a Texas party." The evidence does not support a finding, however, that the second contract, the basis for Calypso's breach of contract claim, was "with a Texas party," because that contract on its face reflects the contracting party to receive payment was Fox Machinery in Pennsylvania. The record establishes the waterjet systems under the second contract were to be shipped FOB Dallas and also establishes Counter Intelligence telephoned Calypso in Texas to inquire about the capabilities of these systems. The record further establishes contacts between Counter Intelligence and Calypso in Texas regarding repairs to the system sold under the first contract, matters not the subject of any claim in the case.

■ In another finding challenged by Counter Intelligence, the trial judge found Calypso's claims "arise from or relate to an act or acts by Counter Intelligence, Inc. by which it purposefully availed itself of the benefit and protections of Texas's laws." Calypso's claims, however, arise from Counter Intelligence's failure to pay amounts due under the second contract. This contract was with a Pennsylvania entity for delivery in Maryland.

Calypso contends, citing *Schott Glas v. Adame,* 178 S.W.3d 307, 317 (Tex.App.-Houston [14th Dist.] 2005, pet. denied), the term "FOB Dallas" in the second contract is jurisdictionally significant and not a mere technicality. As noted by the *Schott Glas* court, the term "F.O.B. Germany" was "significant for jurisdictional purposes because by insuring title passes outside of the forum state, the nonresident defendant is not invoking the benefits and protections of the forum's laws." *Schott Glas,* 178 S.W.3d at 317. The court further noted, "the Texas Supreme Court has rejected the argument that the jurisdictional significance of the F.O.B. designation is a mere

'technicalit[y],' reasoning that it shows the nonresident defendant has exercised its right to deliberately structure its business to avoid the benefits and protections of the forum." *Schott Glas,* 178 S.W.3d at 317 (citing *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806, 808 (Tex. 2002)). Here, the parties did not structure the contract to avoid a particular forum. The question here is whether a Maryland entity purposefully availed itself of the benefits and protections of Texas law by entering into a contract with a Pennsylvania entity for equipment to be paid for in Pennsylvania and used in Maryland, where the contract provided the equipment is to be delivered "F.O.B. Dallas." While we agree with Calypso the inclusion of the "F.O.B. Dallas" term in the contract is a fact of significance in determining whether Counter Intelligence purposefully availed itself of the benefits of Texas law, it is one fact among several to consider in making the determination. Although title passed in Texas, the conduct complained of in Calypso's breach of contract claim relates to Counter Intelligence's failure to pay the amount due under the contract. This breach arose out of Counter Intelligence's conduct in Pennsylvania and Maryland, not Texas.

■ We next review the correctness of the trial judge's legal conclusions based on the findings of fact. We hold the trial judge erred in concluding Texas could exercise specific jurisdiction over Counter Intelligence. The trial judge's conclusion is based primarily upon Calypso's actions (for example, the location of Calypso's bank accounts, the location of Calypso's service representative, and the issuing of invoices by Calypso), not the actions of Counter Intelligence. In addition, Calypso's breach of contract claim against Counter Intelligence does not arise out of the contract for the first waterjet system. It is undisputed Counter Intelligence accepted delivery of the first system and paid for it. Calypso's only breach of contract claim arises out of the contract for the second and third waterjet systems, for which Counter Intelligence contracted with a Pennsylvania entity. Calypso's Second Amended Petition also alleges claims against Counter Intelligence for interference with Calypso's existing and prospective business relations, business disparagement, and conspiracy. Calypso did not plead that any of Counter Intelligence's alleged tortious actions giving rise to these claims occurred in Texas.

Counter Intelligence's awareness that Calypso was located in Texas and that the waterjet systems would be shipped from Texas is not enough to establish that Counter Intelligence purposefully availed itself of the privilege of doing business in Texas. Calypso's claims do not arise out of activity by Counter Intelligence in Texas. *See Helicopteros,* 466 U.S. at 414, 104 S.Ct. 1868 (essential foundation of in personam jurisdiction is relationship among the defendant, the forum, and the litigation). We sustain Counter Intelligence's first and second issues.

General Jurisdiction

In its third issue, Counter Intelligence contends the trial judge erred in concluding it had substantial continuous and systematic contacts with Texas supporting the exercise of general jurisdiction. In its fourth issue, Counter Intelligence challenges the legal and factual sufficiency of the evidence to support the trial judge's findings regarding general jurisdiction.

The trial judge found:

Counter Intelligence has been a party to an exclusive distribution agreement with Cosentino USA ... since 1999. Cosentino USA is headquartered in Stafford, Texas. This relationship

has resulted in numerous payments by Counter Intelligence to Cosentino in Texas exceeding $13 million dollars over approximately six years via over 200 wire transfers to Cosentino's Texas account. Counter Intelligence's relationship with Cosentino forms the basis for its website marketing, including press releases issued from Houston, Texas, contained on Counter Intelligence's website. Counter Intelligence also advertises to its customers the warranty provided by Cosentino. Counter Intelligence and Cosentino had meetings in Texas to discuss joint marketing on a nationwide basis. The relationship is ongoing and continuing.

The trial judge later made additional findings regarding the relationship between Cosentino and Counter Intelligence, including a finding that ninety percent of the countertops manufactured by Counter Intelligence are made of a material called Silestone obtained from Cosentino USA.

We overrule Counter Intelligence's fourth issue. The trial judge's findings regarding Counter Intelligence's relationship with Cosentino are supported by evidence which was not disputed by Counter Intelligence. There is more than a scintilla of evidence to support these findings, and they are not so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *See Hoffmann,* 180 S.W.3d at 345.

We next determine whether the trial judge correctly concluded that these facts established the substantial continuous and systematic contacts with Texas necessary to give rise to general jurisdiction over Counter Intelligence in Texas. While Cosentino is headquartered in Stafford, Texas, none of the Silestone purchased by Counter Intelligence giving rise to the millions of dollars in invoices cited by the trial judge ever passed through Texas. Counter Intelligence offered undisputed evidence the Silestone was manufactured in Italy and shipped to Virginia for eventual sale by Counter Intelligence in Maryland, Virginia, and the District of Columbia. The distribution agreement between Cosentino and Counter Intelligence notes that Cosentino is a Florida corporation and a subsidiary of Cosentino SA of Spain; Counter Intelligence is a Maryland corporation; and Counter Intelligence "desires to fabricate, promote, market, sell, install and service" Silestone "in the county of Montgomery located in the State of Maryland; the counties of Arlington and Fairfax and the city of Alexandria located in the Commonwealth of Virginia and in the City of Washington located in the District of Columbia," defined as the "Territory." The distribution agreement further provides it "shall be governed, construed and interpreted in accordance with the law of the State of Minnesota in the United States," and any claim or action for breach of the agreement "shall be brought in the Ramsey County District Court for the State of Minnesota." Cosentino promises it will advertise Silestone products on a regional and national level, and also promises it will provide Counter Intelligence with all leads it receives for sales in Counter Intelligence's Territory. Thus while the evidence established Counter Intelligence sent payments to Cosentino in Texas, the evidence also established the terms of the parties' agreement and the substance of their activities under it have no connection with Texas.

■ The trial judge also cited "meetings" by representatives of Counter Intelligence regarding marketing of Silestone that took place in Texas. The evidence established two meetings between representatives of Counter Intelligence and Cosentino took place in Texas regarding a

television advertisement to take place during the Super Bowl. A meeting does not constitute continuous and systematic contacts with a forum. *See Helicopteros*, 466 U.S. at 416, 104 S.Ct. 1868 (single trip to Houston by chief executive officer of Helicol was not contact of continuous and systematic nature and thus could not support assertion of in personam jurisdiction over corporation in Texas). There is also no dispute that Counter Intelligence does not advertise or sell its products in Texas. The marketing discussed at the meetings was directed to Counter Intelligence's sales in its market area in Maryland, Virginia, and the District of Columbia.

Calypso also points to Counter Intelligence's website on which it advertises its use of Cosentino's products, including an advertisement regarding Cosentino's guarantee for Silestone. In Texas, courts have adopted a "sliding scale" to determine whether Internet use can constitute minimum contacts with a forum for jurisdictional purposes. At one end of the scale are websites clearly used for transacting business over the Internet, which may be sufficient to establish minimum contacts with a state. *See Reiff*, 115 S.W.3d at 705. At the other end of the scale are "passive" websites used only for advertising over the Internet and are not sufficient to establish minimum contacts even though they are accessible to residents of a particular state. *See Reiff*, 115 S.W.3d at 705–06. It appears there are two types of Internet activity alleged by Calypso as a basis to establish minimum contacts. First, Calypso alleges Counter Intelligence advertises its relationship with Cosentino on its website and "markets the ten-year warranty offered by Cosentino USA for its Silestone product." Calypso does not allege, however, that the website is interactive so that customers in Texas may purchase products from Counter Intelligence. Second, Calypso alleges Counter Intelligence uses the Internet to place its orders for Silestone with Cosentino. Calypso alleges Counter Intelligence and Cosentino use Cosentino's software to exchange information over the Internet regarding the purchase, processing, and shipment of the Silestone. Although Counter Intelligence and Cosentino can interact with each other over the Internet through use of this software, the resulting communication is less like a "website" available to anyone with access to the Internet, analyzed in cases such as *Reiff*, and more like the placing of a traditional purchase order by mail, telephone, or facsimile and making similar contacts to determine the status of an order or a shipment, but through the use of more current technology. While Counter Intelligence's passive website does not bear on the minimum contacts analysis, its use of the Internet to make purchases and check status of orders is contact with a party who is accepting the communications and responding in Texas.

The Texas Supreme Court discussed general jurisdiction in *American Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801 (Tex.2002). In that case, Coleman and other Gulf War veterans sued ATCC for selling material, equipment, and technology to Iraq that was used to create biological and chemical weapons. *Coleman*, 83 S.W.3d at 804. ATCC was a nonprofit research organization that served as a long-term repository center for living microorganisms, viruses, and cell lines, and sold biological research material to research institutes and commercial manufacturers around the world. *Coleman*, 83 S.W.3d at 804. The trial judge denied ATCC's special appearance, and the court of appeals affirmed, holding jurisdiction was proper because ATCC's Texas sales were "numerous and repetitive." *Coleman*, 83 S.W.3d at 804. ATCC did not have offices, distributors, employees, or

real property in Texas, but did have contacts with Texas which the supreme court described:

> ATCC has sold its products to Texas residents for at least eighteen years. At the commencement of this suit, ATCC's Texas sales accounted for 3.5 percent of its total annual sales and five percent of its total U.S. sales, generating approximately $350,000 in revenue.... In addition to selling goods to Texas residents, ATCC also serves as a repository for Texas researchers seeking microorganism patents. For the fifteen to twenty-year period before this suit, nearly 2.7 percent of the 13,000 patents in ATCC's Maryland repository came from Texas residents.... [I]n 1991, ATCC contracted with the University of Texas Southwestern Medical Center to propagate and test cell lines.... Over a five-year period, ATCC purchased approximately $378,000 of supplies from thirty-three Texas vendors. Some of the goods were sent F.O.B. from Texas. And from 1987 to 1994, ATCC representatives attended five scientific conferences in Texas. At four conferences, ATCC had an exhibit booth and distributed corporate publications.

*Coleman,* 83 S.W.3d at 807–08.

Despite these contacts, the supreme court reversed the court of appeals' judgment and rendered judgment dismissing the case for lack of personal jurisdiction. *Coleman,* 83 S.W.3d at 804. The court disagreed that ATCC's Texas sales could be a basis for personal jurisdiction, because the sales were made F.O.B. Wichita, demonstrating ATCC's intent not to avail itself of the protections and benefits of Texas law. *See Coleman,* 83 S.W.3d at 808. Further, the court relied on *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80

L.Ed.2d 404 (1984), in holding ATCC's Texas purchases were an insufficient basis for jurisdiction: "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Coleman,* 83 S.W.3d at 808 (quoting *Helicopteros,* 466 U.S. at 418, 104 S.Ct. 1868). ATCC's repository contracts and its contract with the University of Texas Southwestern Medical Center did not support a finding of general jurisdiction because ATCC signed and performed those contracts in Maryland. *Coleman,* 83 S.W.3d at 808. ATCC's attendance at the five Texas conferences did not support the exercise of general jurisdiction because ATCC did not select the conference locations. *Coleman* 83 S.W.3d at 809.

The court did not end its general jurisdiction analysis with an evaluation of ATCC's individual contacts, stating "we do not view each contact in isolation." *Coleman,* 83 S.W.3d at 809. The court explained, "[a]ll contacts must be carefully investigated, compiled, sorted, and analyzed for proof of a pattern of continuing and systematic activity." *Coleman,* 83 S.W.3d at 809. The court found the facts similar to those in *Helicopteros. Coleman,* 83 S.W.3d at 809. Noting it must evaluate the quality of contacts rather than the quantity, the court concluded:

> And in this case, we are not persuaded that the quality of ATCC's contacts support general jurisdiction as defined by the United States Supreme Court. ATCC does not advertise in Texas, has no physical presence in Texas, performs all its business services outside Texas, and carefully constructs its contracts to ensure it does not benefit from Texas laws.... Under these circumstances, we must con-

clude that ATCC's contacts with Texas were not continuous and systematic.

*Coleman,* 83 S.W.3d at 809–10.

Calypso relies on our opinion in *Temperature Systems, Inc. v. Bill Pepper, Inc.,* 854 S.W.2d 669 (Tex.App.-Dallas 1993, writ dism'd by agr.). Counter Intelligence argues our opinion in *Temperature Systems* is at least distinguishable from, if not inconsistent with, the United States Supreme Court's reasoning in *Helicopteros.* In *Temperature Systems,* we held the defendant had sufficient minimum contacts for a Texas court to exercise general jurisdiction. *Temperature Sys.,* 854 S.W.2d at 676. TSI was a Wisconsin corporation with its principal place of business in Wisconsin, distributing HVAC equipment manufactured by Carrier. *Temperature Sys.,* 854 S.W.2d at 671. It sold equipment in Wisconsin, Michigan, and Northern Illinois, and did not advertise or solicit business in Texas. *Temperature Sys.,* 854 S.W.2d at 671–72. However, TSI had a relationship with other Carrier distributors across the United States, including Texas, under which it transferred equipment to and purchased equipment from Carrier distributors in Texas. *Temperature Sys.,* 854 S.W.2d at 672. We cited the following facts in support of our holding:

> TSI purchased almost $500,000 worth of equipment from Texas residents, including Carrier distributors and non-Carrier distributors, between 1987 and 1990. Since 1975, TSI has maintained a distributor relationship with Carrier distributors in Texas, pursuant to which TSI transfers equipment to and purchases equipment from Texas Carrier distributors.

*Temperature Sys.,* 854 S.W.2d at 676.

In *Helicopteros,* the petitioner Helicol was a Colombian corporation with its principal place of business in Bogota, Colom-

bia. *Helicopteros,* 466 U.S. at 409, 104 S.Ct. 1868. It was engaged in the business of providing helicopter transportation for oil and construction companies in South America. *Helicopteros,* 466 U.S. at 409, 104 S.Ct. 1868. Although the parties agreed specific jurisdiction was not proper in Texas for the suit arising out of a helicopter crash in Peru, the Supreme Court of Texas held Texas courts could exercise general jurisdiction over Helicol. *Helicopteros,* 466 U.S. at 412–13, 415. The facts relevant to the general jurisdiction analysis were as follows:

> Aside from the negotiation session in Houston [which Helicol's chief executive officer attended] . . . , Helicol had other contacts with Texas. During the years 1970–77, it purchased helicopters (approximately 80% of its fleet), spare parts, and accessories for more than $4 million from Bell Helicopter Company in Fort Worth, In that period, Helicol sent prospective pilots to Fort Worth for training and to ferry the aircraft to South America. It also sent management and maintenance personnel to visit Bell Helicopter in Fort Worth during the same period in order to receive "plant familiarization" and for technical consultation. Helicol received into its New York City and Panama City, Fla. bank accounts over $5 million in payments from Corsorcio/WSH drawn upon First City National Bank of Houston.

*Helicopteros,* 466 U.S. at 411, 104 S.Ct. 1868. The *Helicopteros* court rejected the Texas Supreme Court's reliance on these facts to establish general jurisdiction. *Helicopteros,* 466 U.S. at 417, 104 S.Ct. 1868. Citing its opinion in *Rosenberg Bros. & Co. v. Curtis Brown Co.,* 260 U.S. 516, 43 S.Ct. 170, 67 L.Ed. 372 (1923), the court held "purchases and related trips, standing alone, are not a sufficient basis

for a State's assertion of jurisdiction." *Helicopteros,* 466 U.S. at 417, 104 S.Ct. 1868. The court concluded, "[i]n accordance with *Rosenberg,* we hold that mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Helicopteros,* 466 U.S. at 418, 104 S.Ct. 1868.

 For general jurisdictional purposes, we do not view each contact in isolation. *Coleman,* 83 S.W.3d at 809. We look to the quality of the contacts rather than the quantity. *Coleman,* 83 S.W.3d at 809–10. Our opinion in *Temperature Systems* is distinguishable, especially when juxtaposed with *Helicopteros* and *Coleman.*[1] Examining the quality of Counter Intelligence's contacts with Texas, Counter Intelligence through its purchases seeks to acquire Italian materials for use in its Maryland business, for sale to customers in Maryland, Virginia, and the District of Columbia. The materials are not shipped through Texas, and the parties chose the law of Minnesota for resolving their disputes. Payment is sent by wire transfer to Texas, to Cosentino's Texas bank accounts, and Cosentino's office is located in Texas. The location of Cosentino's Texas office and Texas bank accounts, however, are not the result of Counter Intelligence's purposeful availment of the benefits of Texas law; rather, they are the result of Cosentino's actions. In *Temperature Systems,* while TSI did not seek customers in Texas, it did enter into agreements with Texas companies under which it bought and sold equipment in Texas. We held that through those contacts TSI "should reasonably anticipate being called into

court in Texas." *Temperature Sys.,* 854 S.W.2d at 676. Here, in contrast, if a dispute arose between Cosentino and Counter Intelligence, it would be resolved under Minnesota law in a Minnesota court. Counter Intelligence's contacts with Texas are of similar quantity and quality to Helicol's in *Helicopteros* and ATCC's in *Coleman.* We follow the *Helicopteros* and *Coleman* courts' reasoning and hold Counter Intelligence's contacts with Texas were insufficient to establish general jurisdiction. *See Helicopteros,* 466 U.S. at 418–19, 104 S.Ct. 1868; *Coleman,* 83 S.W.3d at 809–10. We sustain Counter Intelligence's third issue.

## Fair Play and Substantial Justice

In its fifth issue, Counter Intelligence contends the trial court's exercise of jurisdiction over it offends traditional notions of fair play and substantial justice. Because we have concluded Counter Intelligence did not have the required minimum contacts with Texas, we need not consider this issue. *See* TEX.R.APP. P. 47.1.

We reverse the trial court's order and render judgment dismissing Calypso's claims against Counter Intelligence.

---

1. Because we conclude *Temperature Systems* is distinguishable, we need not address appellant's argument that *Temperature Systems* is inconsistent with *Helicopteros.* We acknowl-

edge, however, that *Temperature Systems* does not directly apply the "quality of contacts" analysis employed in *Coleman* and therefore its continued viability may be in question.