Patrick W. **MURRAY**, Jr., Appellant,

v.

**EPIC ENERGY RESOURCES, INC., Appellee.**

**and**

**In re Patrick W. Murray, Jr.**

Nos. 09–09–00052–CV, 09–09–00127–CV.

Court of Appeals of Texas, Beaumont.

Submitted May 28, 2009.

Decided Nov. 5, 2009.

Thomas A. Zabel, Holly Dobbs Arnold, Zabel Freeman, Houston, for appellant/relator.

Wendy Knight, Stibbs & Co., P.C., Spring, for appellee/real party in interest.

Before McKEITHEN, C.J., KREGER and HORTON, JJ.

## OPINION

STEVE McKEITHEN, Chief Justice.

Appellant Patrick W. Murray, Jr. filed an interlocutory appeal from the trial court's orders denying his special appearance, temporarily enjoining him, denying his motion to compel arbitration, and abating a pending arbitration between Murray and his former employer, appellee Epic Energy Resources, Inc. ("Epic"). Murray also filed a petition for writ of mandamus, in which he also argues that the trial court abused its discretion by denying his motion to compel arbitration, by abating the pending arbitration, and "not ordering the parties[ ] to arbitrate the issues which clearly fall within the arbitration provision." We affirm the trial court's order denying Murray's special appearance, reverse the trial court's temporary injunction order, and deny the petition for writ of mandamus.

### BACKGROUND

Murray entered into an employment agreement with Epic [1], a company located in The Woodlands, Texas.[2] The agreement provided that Epic could terminate Murray immediately for good cause, "without any further liability to" Murray. According to the terms of the agreement, if Epic terminated Murray's employment without good cause, Murray would receive severance pay from Epic.

The agreement also stated that Epic would provide confidential information, and Murray agreed that both during and after his employment with Epic, he would "not directly or indirectly disclose any [c]onfidential [i]nformation[.]" The agreement expansively defined "[c]onfidential [i]nformation" as:

information pertaining to, but not limited to: customer lists, bid policies and practices, pricing information, financial and other data, contract information, employee lists, manuals, documentation, forms, contracts, agreements, literature, sources of supply, specifications, techniques, engineering, training methods, procedures, systems, data, computer software programs, source codes, hardware development, plans, processes, inventions, discoveries, proprietary technology, methods, trademarks, trade secrets, know-how, corporate books and records, other information concerning [Epic's] business or assets or financial condition and evaluations and use or

---

**1.** Before the parties executed the employment agreement, Murray was an employee of Pearl Development Company ("Pearl"), a Colorado company with its principal office in Colorado. Epic acquired Pearl in 2007, and Pearl became a wholly-owned subsidiary of Epic. As part of its acquisition of Pearl, Epic asked certain Pearl employees, including Murray, to execute employment agreements with Epic.

**2.** The parties agree that Epic is a Colorado corporation with its principal place of business in Texas.

non-use of other technical or business information not in the public domain and research projects and customer-specific information disclosed to [Murray] by [Epic] which is not generally known to the public.

In addition, the agreement contained a non-competition provision, which provided as follows, in pertinent part:

[Murray] acknowledges and agrees that as an employee and representative of [Epic], [Murray] will be responsible for building and maintaining business relationships and goodwill with current and future customers, clients, and prospects on a personal level....

....

In consideration for the valuable consideration described above, [Murray] acknowledges and agrees that for a period commencing upon [his] termination of employment from [Epic] for any reason, and ending on the earlier of: (I) twenty-four (24) months following the termination of this Agreement; (ii) the expiration of the Initial Term ... or (iii) the expiration of the then-current Renewal Term ... (hereinafter, the "**Lock Out Period**"), [Murray] will not solicit with any person, company, or business that was or is a client, Customer, or prospect of [Epic] ("Restricted Customer"). A person or entity is considered to be a Restricted Customer if [Epic] has taken steps with the direct objective of obtaining business specifically from such person or entity after [Epic] has made a formal proposal or presentation to such person or entity, which may, but need not, include negotiations with such person or entity. [Murray] further acknowledges and agrees that during the Lock Out Period, [he] will not engage in the Same or a Similar Business as [Epic], including working for any compa-ny or business as an agent, consultant, partner, employee, officer, shareholder or independent contractor (but excluding any client or Customer of [Epic]), in the Market Area....

In addition, the agreement contained a provision which required that "[a]ny claim or controversy arising out of or relating to this Agreement, or any breach of this Agreement, shall be settled by final and binding arbitration in Montgomery County, Texas[.]" However, the agreement also specified that "nothing in this Agreement shall be construed to require the arbitration of any claim arising out of or relating to the ***Non–Disclosure, Non–Competition*** or ***Non–Interference*** provisions set forth in this Agreement. These provisions shall be enforceable by any Court of competent jurisdiction and shall not be subject to arbitration under this section." Moreover, the agreement contained a choice of law provision, which stated, "[t]he parties acknowledge and agree that the law of Texas will govern the validity, interpretation, and effect of this Agreement and dispute[s] relating to, or arising out of, the employment relationship between [Epic] and [Murray]."

On May 27, 2008, Epic terminated Murray for cause, and on July 24, 2008, Murray filed a demand for arbitration.[3] In his demand for arbitration, Murray asserted that Epic had provided no legitimate basis for his "for cause" termination, and he sought severance benefits. The case was scheduled for arbitration on January 5, 2009. However, on December 30, 2008, Epic filed a lawsuit against Murray in Montgomery County, Texas. In its lawsuit, Epic asserted claims against Murray for breach of the non-disclosure and non-competition provisions of the employment agreement, as well as misappropriation of

---

**3.** Murray subsequently began working for En-Cana, a client of Epic.

trade secrets, breach of fiduciary duty, and tortious interference with existing and prospective contracts. Epic also sought a temporary restraining order and a temporary injunction.

Murray filed a special appearance, in which he asserted that he was a resident of Colorado and that the District Court in Montgomery County, Texas lacked personal jurisdiction over him. In support of his special appearance, Murray attached his affidavit, in which he averred, among other things, that he has never worked in Texas; Epic is a Colorado corporation; he signed the employment agreement outside Texas; he worked for Pearl only in Colorado; his paychecks were made from Pearl accounts located outside Texas; and his employment benefits were administered from offices in Colorado. Murray also averred in the affidavit that during his employment, he traveled to Texas to meet with clients or for management meetings on four occasions. Murray maintained that it would be unduly burdensome for him to litigate in Texas.

Epic filed a response to Murray's special appearance, in which it argued that the trial court could exercise both general and specific jurisdiction over Murray. Epic also argued that Murray had "waived his Special Appearance by initiating arbitration proceedings in Montgomery County." Epic contended that the trial court had specific jurisdiction over Murray because Murray did the following: negotiated the terms of his employment with Epic's representatives in Texas; entered into an employment agreement with a Texas resident; agreed that Texas law governs the Agreement; traveled to Texas several times during his seven months of employment with Epic; regularly reported to and worked under the direction of Epic's CEO and President, both of whom worked in Epic's main office in Texas; and demanded

arbitration in Texas. In addition, Epic asserted that Murray's contacts with Texas were frequent, substantial, and "knowingly directed at and accomplished with a Texas resident corporation for the purpose of Murray obtaining and maintaining employment and/or benefits under the Agreement and the laws of the State of Texas." Epic also contended that Murray was subject to the general jurisdiction of Texas.

As support for its response, Epic provided the affidavit of Rex Doyle, the CEO of Epic. Doyle averred that since Epic's inception, Epic had maintained its principal place of business in Texas. Doyle also averred that before and during Murray's employment, he was in contact with Murray multiple times per day, and that he contacted Murray an average of ten to fifteen times per week. In addition, Doyle averred that Murray reported to him during Murray's employment with Epic. Epic also attached to its response the affidavit of John Ippolito, the President of Epic. Ippolito averred in his affidavit that during Murray's employment with Epic, Ippolito contacted Murray approximately once per workday. Ippolito also stated that Murray regularly participated in Epic's management meetings and conference calls, and that Murray was responsible for preparing and providing regular reports to both Ippolito and Doyle.

The trial court denied Murray's special appearance and retained the case on its docket. The trial court's order did not state the basis for its ruling, and the trial court did not file findings of fact and conclusions of law. At the subsequent evidentiary hearing on Epic's request for a temporary injunction, Ippolito testified that Epic acquired Pearl, a Colorado engineering company, in December of 2007. Ippolito signed Epic's employment agreement with Murray. According to Ippolito, before the parties executed the employment

agreement, they negotiated about various aspects of the agreement for "a number of weeks[.]" Ippolito explained that some of the negotiation pertained to the non-competition and non-disclosure provisions, and he opined that a violation of the non-competition agreement could diminish Epic's effectiveness in the marketplace and hinder its success in developing additional business. Ippolito testified that Epic's billings from Pearl had significantly decreased between the third and fourth quarters of 2008. The trial court admitted into evidence a statement of Epic's billings, as well as a spreadsheet of Epic's billable hours.

Ippolito testified that during Murray's employment with Epic, Ippolito had contact with Murray almost daily by telephone or e-mail. According to Ippolito, Murray was responsible for the profits and losses of Pearl, and he was responsible for Pearl's business development, which consisted of contacting clients, putting proposals together, and following up with clients "prior, during, or after projects were executed or completed." Ippolito explained that Murray was also responsible for soliciting new business and expanding business with current clients. Ippolito testified that during Murray's employment with Epic, Murray had access to confidential information, including customer lists, pricing information, financial data, and contract information. When asked whether "there's any way Mr. Murray could work with drop-off without either directly or indirectly disclosing [confidential] information," Ippolito responded that Murray could not do so. Ippolito also testified that he believed it was impossible for Murray's employment with EnCana not to violate the non-competition provisions of the agreement.

Ippolito testified that while Murray was employed with Epic, Pearl provided engineering and construction management services to EnCana, and Pearl had planned to "leverage and expand" its business with EnCana. According to Ippolito, Pearl's business with EnCana has contracted "a lot" since Murray's employment with EnCana, and Ippolito opined that Murray was influencing EnCana because of Murray's dissatisfaction about his termination. On cross-examination, Ippolito admitted that the decline in business from EnCana could have been attributable to a downturn in the energy market. Ippolito testified that Murray returned all of the confidential information in his possession within the time period specified in the agreement, and Ippolito explained that such information becomes dated, so it becomes less important with the passage of time.

At the conclusion of the hearing, the trial court granted Epic's request for a temporary injunction. The trial judge stated,

As far as abating the arbitration, I'm not a fan of arbitration. Our Supreme Court is not a fan of arbitration. If the Supreme Court gets their way in this legislative session, I'll never have to send a case to arbitration again. And I'm not going to do it right now. But it's abated, and I'm not changing my opinion about that. This litigation is more important. This litigation will go forward[.]

In its order granting Epic's request for temporary injunction, the trial court found that Epic had a valid claim against Murray, that there was evidence of imminent harm to Epic, and that "if the Court does not issue the temporary injunction order, the arbitration may cause irreparable injury to [Epic] if the arbitration is concluded before this case." The trial court also found that Murray possessed information that was confidential and proprietary to Epic, that Murray might injure Epic by

disclosing or utilizing the information to Epic's detriment and in violation of the parties' agreement, and that Epic had "no other adequate remedy at law because the harm to [Epic] cannot be accurately calculated in monetary damages."

The trial court's order prohibited Murray from interfering with Epic's

> business operations or EPIC's affiliates' business operations in any way, including breaching the terms of the non-disclosure, non-competition and non-interference provisions of the Employment Agreement between the parties ..., and from communicating directly or indirectly with EPIC, EPIC's employees, agents or representatives outside the presence of the EPIC's counsel.

The order also prohibited Murray from utilizing, divulging, or disseminating Epic's confidential information; "[c]ontacting, soliciting[,] or working for any person, company[,] or business that was or is a client, customer[,] or prospect of ... EPIC o[r] EPIC's affiliate, except that Murray may continue his present employment with En-Cana Oil and Gas until and unless this Court orders otherwise in the future[;]" or engaging in the same or similar business as Epic or its affiliates within the same market area. Furthermore, the court found that the issues before it were not subject to arbitration, abated the pending arbitration proceedings between Murray and Epic, and found that because the facts and issues in the arbitration and the litigation were interrelated, the arbitration issues could not reasonably be evaluated and decided until the litigation was resolved, and allowing the arbitration to continue "would render an unjust, inefficient[,] and unappealable result." Murray then filed an interlocutory appeal, as well as a petition for writ of mandamus. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4), (7) (Vernon 2008) (providing for interlocutory

appeal of the trial court's denial of special appearance and for granting of a temporary injunction). Because the issues raised in the mandamus proceeding and the interlocutory appeal are interrelated, we consider them together.

ISSUE ONE

 In his first issue in the interlocutory appeal, Murray contends the trial court erred by denying his special appearance. "Because the question of a court's exercise of personal jurisdiction over a nonresident defendant is one of law, we review a trial court's determination of a special appearance *de novo.*" *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex.2007) (citation omitted). When, as here, the trial court does not file findings of fact and conclusions of law, we infer all facts necessary to support the judgment and supported by the evidence. *Id.* (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex.2002)).

 A nonresident defendant who files a special appearance bears the burden of negating all of the bases of personal jurisdiction the plaintiff has alleged. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 807 (Tex.2002). Texas courts may exercise *in personam* jurisdiction over a nonresident defendant if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction comports with federal and state constitutional due-process guarantees. *Moki Mac*, 221 S.W.3d at 574 (citing *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex.1990)); *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 2008) (long-arm statute). Under our long-arm statute, a nonresident defendant does business in Texas if it "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state[.]" TEX. CIV.

PRAC. & REM.CODE ANN. § 17.042(1). "[T]he long-arm statute's broad doing-business language allows the statute to 'reach as far as the federal constitutional requirements of due process will allow.'" *Moki Mac,* 221 S.W.3d at 575 (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991)); *see also Am. Type Culture Collection,* 83 S.W.3d at 806. A state may exercise personal jurisdiction over a nonresident defendant if the defendant has established minimum contacts with the forum state, and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Moki Mac,* 221 S.W.3d at 575 (citation omitted). A nonresident defendant's "contacts with the forum state may give rise to either general or specific jurisdiction." *Langston, Sweet & Freese, P.A. v. Ernster,* 255 S.W.3d 402, 407 (Tex.App.-Beaumont 2008, pet. denied) (citing *BMC Software,* 83 S.W.3d at 795).

■ When a defendant's contacts with the forum state have been continuous and systematic, general jurisdiction is established. *BMC Software,* 83 S.W.3d at 796. When the contacts are not continuous and systematic, specific jurisdiction may be established if the defendant's alleged liability "aris[es] out of or [is] related to" an activity conducted within the forum." *Moki Mac,* 221 S.W.3d at 576 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). With respect to specific jurisdiction, courts focus the minimum-contacts analysis on the relationship among the defendant, the forum, and the litigation. *Id.* at 575–76.

■ For a Texas court to exercise specific jurisdiction, the nonresident defendant must have made minimum contacts with Texas by purposefully availing himself of the privilege of conducting business

here, and his liability must have arisen from or be related to those contacts. *Id.* at 576. "[T]here must be a substantial connection between those contacts and the operative facts of the litigation." *Id.* at 585. A "purposeful availment" inquiry involves three parts: (1) consideration of the defendant's contacts with the forum, but "not the unilateral activity of another party or a third person[;]" (2) "the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated[;]" and (3) the defendant must seek a benefit, advantage, or profit by availing itself of the jurisdiction. *Id.* at 575 (citations omitted). "In contrast, a defendant may purposefully avoid a particular forum by structuring its transactions in such a way as to neither profit from the forum's laws nor subject itself to jurisdiction there." *Id.* (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

■ Because it is dispositive, we address the question of specific jurisdiction. For the Montgomery County District Court to properly exercise specific jurisdiction over Murray, Murray must have made minimum contacts with Texas by purposefully availing himself of the privilege of conducting activities here, and his liability must have arisen from or be related to his contacts with Texas; that is, there must be a substantial relationship between Murray's contacts and the operative facts of the litigation. *See Moki Mac,* 221 S.W.3d at 576, 585.

■ We first address Epic's contention that Murray waived his special appearance by demanding arbitration in Texas. As support for its waiver argument, Epic cites *Harbison–Fischer Mfg. Co., Inc. v. Mohawk Data Sciences Corp.,* 823 S.W.2d 679 (Tex.App.-Fort Worth 1991), *judgment set aside by agr.,* 840 S.W.2d 383 (Tex.1992).

However, in *Harbison–Fischer,* the non-resident defendant, Harbison–Fischer, participated in arbitration proceedings after suit was filed; therefore, the court held that Harbison–Fischer had entered "a general appearance in a special proceeding and to have waived any question of jurisdiction." *Id.* at 684. Moreover, the *Harbison–Fischer* court relied on New York law in reaching its decision. *Id.* In the case *sub judice,* Murray filed his demand for arbitration before Epic filed suit against him; therefore, his pre-suit demand for arbitration did not constitute an appearance in the suit later filed by Epic.

Murray entered into a contract for employment with Epic, a corporation that has its principal place of business in Texas. The agreement provided that Murray was to receive a salary, bonuses, and various benefits. Pursuant to the terms of the agreement, Murray was responsible for building and maintaining Epic's business relationships. The contract expressly provided that Texas law would govern any disputes arising from the agreement, and a part of the contract, the arbitration provision, expressly contemplated that it would be performed in Texas.

Although the choice of law provision alone is not dispositive, it is a significant factor that supports Murray's deliberate affiliation with Texas and the foreseeability of litigation in Texas concerning the agreement. *See Burger King,* 471 U.S. at 482, 105 S.Ct. 2174; *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 792 (Tex.2005). In addition, with the exception of disputes concerning the non-disclosure, non-competition, and non-interference provisions of the agreement, the agreement provided that disputes must be arbitrated in Montgomery County, Texas. Murray traveled to Texas on several occasions during his relatively brief employment with Epic, and he admitted that he made the trips either to meet with clients or to attend management meetings. In addition, Murray frequently communicated with and reported to Epic's executives who were based in Texas. Under the circumstances, Murray established minimum contacts with Texas, and the trial court's exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *See Moki Mac,* 221 S.W.3d at 575. In addition, Murray purposefully availed himself of the privilege of conducting business in Texas, and his alleged liability is related to his contacts with Texas. *See id.* at 576. Murray had contacts with Texas, his contacts were purposeful, and he received a benefit by availing himself of this jurisdiction. *See id.* at 575. The trial court did not err by denying Murray's special appearance. Accordingly, we overrule issue one.

### ISSUE FIVE

In his fifth issue, Murray contends, among other things, that the trial court erred by finding that the pending arbitration proceeding would cause irreparable injury to Epic if it was concluded before the litigation. An applicant for a temporary injunction must prove (1) a cause of action against the defendant, (2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002). A trial court's order granting a temporary injunction must state the reasons for its issuance and be specific in its terms. TEX.R. CIV. P. 683. If a temporary injunction does not comply with the mandatory requirements of Rule 683, it is void, and the appellate court should dissolve the temporary injunction. *Qwest Commc'ns Corp. v. AT & T Corp.,* 24 S.W.3d 334, 337 (Tex.2000); *Indep. Cap. Mgmt., L.L.C. v. Collins,* 261 S.W.3d 792, 795 (Tex.App.-Dallas 2008, no pet.). Rule 683 requires a trial court to

set out in a temporary injunction order the reasons it believes the applicant will suffer an imminent and irreparable injury if the court does not grant the injunction. *State v. Cook United, Inc.*, 464 S.W.2d 105, 106 (Tex.1971); *see also* TEX.R. CIV. P. 683. The trial court's reasons must be specific and legally sufficient, and not mere conclusory statements. *Charter Med. Corp. v. Miller*, 547 S.W.2d 77, 78 (Tex.Civ.App.-Dallas 1977, no writ).

 We review an order granting a temporary injunction for abuse of discretion. *Butnaru*, 84 S.W.3d at 204. As a reviewing court, we will not substitute our judgment for that of the trial court unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *Id.* The trial court abuses its discretion if its decision is not supported by substantial and probative evidence. *Envoy Med. Sys., L.L.C. v. State*, 108 S.W.3d 333, 335 (Tex.App.-Austin 2003, no pet.). In addition, "[a] trial court abuses its discretion by issuing a temporary injunction order that does not comply with the requirements of [R]ule 683." *Collins*, 261 S.W.3d at 795 (citation omitted).

 In this case, the trial court found in its temporary injunction order that Epic would suffer imminent, irreparable harm if the arbitration concluded before the litigation; however, the arbitration involved only the issue of whether Epic lacked a basis for its "for cause" termination and, as a result, owed severance benefits to Murray. The various claims Epic asserted against Murray in its lawsuit all stem from Murray's alleged violations of the agreement after Epic terminated his employment. The evidence adduced at the temporary injunction hearing does not support the trial court's conclusion that Epic would be harmed if the issue raised by Murray in the arbitration proceeding was determined before the litigation concluded. *See Envoy*

*Med. Sys.*, 108 S.W.3d at 335. In addition, the language in the temporary injunction regarding irreparable harm is not sufficiently specific to comply with Rule 683. *See* TEX.R. CIV. P. 683; *see also Charter Med. Corp.*, 547 S.W.2d at 78. Therefore, we reverse the trial court's temporary injunction order and dissolve the temporary injunction. Because the trial court also stayed the arbitration in its temporary injunction order, which we have dissolved, we need not address Murray's remaining issues, and Murray's petition for writ of mandamus is moot.

AFFIRMED IN PART; REVERSED IN PART; PETITION FOR WRIT OF MANDAMUS DENIED.

CHARLES KREGER, Justice, concurring and dissenting.

Because I would find no specific jurisdiction, I respectfully dissent in part and concur in part to the majority's opinion. For a Texas court to exercise specific jurisdiction, (1) the nonresident defendant must have made minimum contacts with Texas by purposefully availing himself of the privilege of conducting business here, and (2) the nonresident defendant's liability must have arisen from or be related to those contacts. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 576 (Tex. 2007). In *Moki Mac*, the Texas Supreme Court addressed the extent to which a claim must "arise from or relate to" the nonresident's forum contacts to confer specific jurisdiction. The Court concluded that "for a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation." *Id.* at 585. This analysis focuses on the relationship among the nonresident, the forum, and the litigation. *Pelican State Physical Therapy, L.P. v. Bratton*, No. 01–06–

00199–CV, 2007 WL 2833303, at *6 (Tex. App.-Houston [1st Dist.] Sept. 27, 2007, no pet.) (mem. op.) (citing *Counter Intelligence, Inc. v. Calypso Waterjet Sys., Inc.,* 216 S.W.3d 512, 517 (Tex.App.-Dallas 2007, pet. denied)). Specifically, the allegedly wrongful conduct must have been purposefully directed at or have occurred in the forum and must have "a 'substantial connection,' resulting in the alleged injuries," to the operative facts of the litigation. *Id.* (citing *Moki Mac,* 221 S.W.3d at 584). Several Texas cases have found the "arises from or is related to" prong of the specific jurisdiction analysis unsatisfied when the nonresident defendant's conduct that allegedly resulted in liability did not relate to the defendant's contacts with the forum state. *See Gonzalez v. AAG Las Vegas, L.L.C.,* No. 01–08–0037–CV, 2009 WL 1562934, at *5 (Tex.App.-Houston [1st Dist.] June 4, 2009, no pet. h.) (reversing trial court's order denying special appearance where, given the pleadings, the operative facts regarding appellee's alleged breach of loyalty and usurpation claims concern defendant's acts while working in Las Vegas, Nevada, not Texas); *Pelican,* 2007 WL 2833303, at *8 (noting that the trial court properly concluded it could not exercise personal jurisdiction where the operative facts related to acts that occurred outside the forum state); *Counter Intelligence, Inc.,* 216 S.W.3d at 520 (noting the trial court erred in concluding that Texas could exercise specific jurisdiction over defendant where the alleged breach of contract arose out of Counter Intelligence's conduct in Pennsylvania and Maryland, not Texas); *Gustafson v. Provider HealthNet Servs., Inc.,* 118 S.W.3d 479, 484 (Tex.App.-Dallas 2003, no pet.) (noting that none of the contacts relied upon to establish specific jurisdiction were related to defendant's execution of the confidentiality agreement or his dissemination of confidential information, both of which oc-

curred in Michigan, not Texas); *Lang v. Capital Res. Invs., I & II, LLC,* 102 S.W.3d 861, 866 (Tex.App.-Dallas 2003, no pet.) (holding no specific jurisdiction where alleged tortious conduct was not related to defendant's contacts with Texas).

Likewise, here Murray's contacts are insufficient to confer specific jurisdiction because the acts alleged to create liability do not arise out of and are not related to Murray's contacts with Texas. The facts alleged in support of Epic's claims for breach of contract, trade secrets misappropriation, breach of fiduciary duty, and tortious interference with existing contracts all relate to conduct that allegedly took place in Colorado.

In its petition, Epic alleges that Murray breached his employment agreement by violating the non-disclosure and non-competition provisions. Specifically, Epic alleges that Murray testified at his deposition that he was working as a consultant for EnCana Oil and Gas and thus, breached his employment agreement with Epic by disclosing confidential information obtained by Murray while working at Epic. Epic further alleges that Murray misappropriated trade secrets by using and disclosing confidential, proprietary, and trade-secret information to EnCana. Murray averred that he was working in EnCana's Denver, Colorado offices. Epic does not allege that any of the confidential, proprietary or trade-secret information was either obtained by Murray in Texas or disclosed by Murray in Texas.

Epic further alleges that Murray breached his fiduciary duties to Epic by engaging in self dealing; failing to treat employees equally; usurping corporate opportunities; and failing to act with integrity, good faith, loyalty, and honesty during his employment with Epic. None of the facts alleged in support of these allegations arise out of or are related to Murray's

alleged contacts with Texas. Rather, the allegations made in support of these claims relate to actions by Murray while working in Colorado. Epic further alleges that Murray tortiously interfered with Epic's existing and prospective contracts with EnCana. Murray, however, was employed by EnCana in its Colorado office.

The United States Supreme Court's holding in *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), is distinguishable from the present case. In *Burger King,* the franchise agreement required partial performance in the forum state; specifically, the franchisee's payments under the contract were required to be made at Burger King's place of business in Florida. *Id.* at 466, 468, 105 S.Ct. 2174. Failure to make the required payments formed a part of the basis of Burger King's suit against the franchisee. *Id.* at 468, 105 S.Ct. 2174. Therefore, the alleged breach of the agreement occurred, at least in part, in Florida. As noted by the *Pelican* court, the nonresident defendant in *Burger King* was sued for some of the same contractual obligations that constituted, or were closely related, to his asserted contacts with Florida. *Pelican,* 2007 WL 2833303, at *9. Here, in contrast, the specific contractual obligations that Epic argues constitute Murray's contacts with Texas were not those that Murray was alleged to have breached and the tortious acts that Epic alleges Murray committed were alleged to have been committed in Colorado.

"When an employee lives and works outside of Texas, employment 'by a company with its principal place of business in Texas is not sufficient to establish the requisite minimum contacts with Texas.'" *Rushmore Inv. Advisors, Inc. v. Frey,* 231 S.W.3d 524, 530 (Tex.App.-Dallas 2007, no pet.) (quoting *Gustafson,* 118 S.W.3d at 483). After reviewing Murray's contacts as a whole in light of the claims alleged, I would conclude Murray's contacts with Texas are not sufficient to establish specific jurisdiction. *See generally Moki Mac,* 221 S.W.3d at 585, 588; *Gonzalez,* 2009 WL 1562934, at **5–6; *Pelican,* 2007 WL 2833303, at **8–9; *Gustafson,* 118 S.W.3d at 483–84. None of the contacts relied upon by Epic to establish jurisdiction are connected to Murray's alleged breach of contract, misappropriation of trade secrets, breach of fiduciary duty, or interference with existing or prospective contracts, all of which occurred if at all, in Colorado. Instead, the contacts Epic relies on "relate only superficially to [Murray's] general employment relationship" with Epic. *See Gustafson,* 118 S.W.3d at 484.

I disagree with the majority's opinion that a choice of forum in an arbitration provision in a contract indicates that the contract is performable in part in the state of the selected forum and should be considered a factor when determining jurisdiction. The very purpose of an arbitration provision is to prevent subjecting the parties to litigation in the event of a dispute. *See Cayan v. Cayan,* 38 S.W.3d 161, 166 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) ("[T]he purpose of alternative dispute measure is to keep parties out of the courtroom."); *see also Werline v. E. Tex. Salt Water Disposal Co.,* 209 S.W.3d 888, 896 (Tex.App.-Texarkana 2006, pet. granted) ("The purpose of arbitration is to avoid the formalities, delay, and expense of ordinary litigation.").

I would conclude the trial court did not have specific jurisdiction over Murray and should have granted his special appearance. I would vacate the trial court's order granting the temporary injunction for lack of jurisdiction and dissolve the trial court's order abating the arbitration for that reason. However, I agree with the majority's holding that the evidence ad-

duced at the temporary injunction hearing does not support the trial court's conclusion that Epic would be harmed if the issue raised by Murray in the arbitration proceeding was determined before the litigation concluded and concur in that part of the majority's opinion that dissolves the temporary injunction.